UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PATRICIA RANTA, NICHOLAS RANTA, and
PRISCILLA RANTA,

                              Plaintiffs,                    Index No. 14-cv-3794 (SLT)(JMA)

        -against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, and LOUIS SCARCELLA,
and STEPHEN CHMIL, individually and as
Members of the New York City Police Department,
and JOHN AND JANE DOE POLICE OFFICERS
#1-15,

                              Defendants.
----------------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**

MAVRONICOLAS & DEE LLP
Peter C. Dee, Esq.
415 Madison Avenue, 18th Floor
New York, New York  10017
(646) 770-1256 (Phone)
(866) 774-9005 (Fax)

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................ii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS .............................................................................. 1

ARGUMENT................................................................................................... 9

Point I

LEGAL STANDARD FOR
MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6).................................. 9

Point II

PLAINTIFFS STATE VALID CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983 ............. 9

    A.    Plaintiffs' Complaint Alleges Valid
           Familial Association Claims.............................................................. 10

    B.    Plaintiffs' Complaint Alleges Valid Claims
           for Denial of Access to Courts. ......................................................... 14

Point III

DEFENDANTS CHMIL AND SCARCELLA ARE NOT
ENTITLED TO QUALIFIED IMMUNITY ........................................................ 17

Point IV

PLAINTIFFS STATE A CLAIM FOR MUNICIPAL LIABILITY ....................... 18

CONCLUSION ............................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635, 640 (U.S. 1987) ...................................................17

*Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003) ......................................10, 11

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).............................9

*Barrett v. United States*, 798 F.2d 565, 575 (2d Cir. 1986) ...........................................15

*Christopher v. Harbury*, 536 U.S. 403, 122 S. Ct. 2179,
    153 L. Ed. 2d 413 (1974) ..........................................................................14, 15, 16

*County of Sacramento v. Lewis,* 523 U.S. 833, 140 L. Ed. 2d 1043,
    118 S. Ct. 1708 (1998) ...........................................................................11, 12, 13

*Daniels v. Williams*, 474 U.S. 327 (1986) ......................................................................12

*Dusenbury v. City of New York*, 1999 U.S. Dist. LEXIS 5039 (S.D.N.Y. Apr. 8, 1999) ............13

*Farella v. City of New York*, No. 05-CV-8264, 2007 U.S. Dist. LEXIS 63087,
    2007 WL 2456886 (S.D.N.Y. Aug. 22, 2007) .............................................................15

*Hartline v. Gallo*, 546 F.3d 95 (2d Cir. 2008) ................................................................18

*Katzman v. Essex Waterfront Owners LLC,* 660 F.3d 565 (2d Cir. 2011) .......................9

*Kelson v. City of Springfield*, 767 F.2d 651 (9th Cir. 1985) ...........................................10

*Kogut v. County of Nassau*, 2009 U.S. Dist. LEXIS 67940 (E.D.N.Y. Aug. 3, 2009) ..........11, 12

*Marshall* v. *Sullivan,* 105 F.3d 47 (2d Cir. 1996) ...........................................................18

*McCray v. City of New York*, 2007 U.S. Dist. LEXIS 90875 (S.D.N.Y. Dec. 11, 2007).............13

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018,
    56 L. Ed. 2d 611 (1977).....................................................................18, 19, 20

*Monroe v. Pape*, 365 U.S. 167, 187 (1961).....................................................................18

*Oliva v. Town of Greece,* 2014 U.S. Dist. LEXIS 166481 (W.D.N.Y. Dec. 1, 2014) ................16

*Patel v. Searles* 305 F.3d 130 (2d Cir. 2002) .........................................................11, 12

*Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ...........................19, 20

*Quilloin v. Walcott,* 434 U.S. 246, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978) ................................10

*Roberts v. United States Jaycees*, 468 U.S. 609, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984) .......10

*Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952) ....................................12

*Rothfarb v. Brookdale Hosp.*, 139 A.D.2d 720, 527 N.Y.S.2d 473, 475 (2d Dep't 1988) ..........17

*Santosky v. Kramer*, 455 U.S. 745, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982) ..........................10

*Small v. City of New York*, 274 F. Supp. 2d 271 (E.D.N.Y. 2003), vacated and remanded on other grounds sub nom. *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005) ...........................................15

*Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987), overruled on other grounds by *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) ...............................................10

*Sousa v. Marquez*, 702 F.3d 124 (2d Cir. 2012) ........................................................................15

*Stevens v. Webb*, 2014 U.S. Dist. LEXIS 37874 (E.D.N.Y. Mar. 21, 2014) ..........................14, 15

*Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997) ....................................................15

*Vaughn v. Air Line Pilots, Ass'n, Int'l*, 377 Fed. Appx. 88 (2d Cir. N.Y. 2010) ...........................9

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ............................................................................17

*White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988) ....................................................................18

*Whitley v. Albers*, 475 U.S 312 (1986) ....................................................................................13

*Zahrey v. Coffee*, 221 F.3d 342, 355 (2d Cir. 2000) .............................................................17, 18

**Other Authorities**

*Due Process Clause of the Fourteenth Amendment* ....................................................................10

42 U.S.C. § 1983 ..........................................................................................................................9

Fed. R. Civ. P. 8(a)(2) ..................................................................................................................9

Fed. R. Civ. P. 12(b)(6) ................................................................................................................9

N.Y. Gen. Mun. Law §§ 50-e and 50-i..........................................................................................16

## PRELIMINARY STATEMENT

This is a civil rights action against the City of New York ("City"), the New York City Police Department ("NYPD"), and Detectives Scarcella, Chmil and unnamed individual employees and agents of the NYPD, for violation of civil rights of plaintiffs, the wife and children of David Ranta, stemming from his wrongful arrest, conviction, and imprisonment. Plaintiff Patricia Ranta is the former wife of David Ranta, and both are parents of Nicholas and Priscilla Ranta. Plaintiffs were deprived of their rights of access to courts and to maintain intimate familial relations with David Ranta, who was maliciously and despotically torn away from them and wrongfully imprisoned for over twenty-three years for a highly publicized murder that he did not commit.

Plaintiffs submit this memorandum of law in opposition to the motion to dismiss by defendants City of New York, New York City Police Department ("NYPD") and Stephen Chmil, joined by defendant Louis Scarcella[1].

## STATEMENT OF FACTS

On February 8, 1990, Chaim Weinberger, a jewelry courier, left his apartment building in the vicinity of 130 Clymer Street in the Williamsburg neighborhood of Brooklyn carrying a suitcase full of diamonds and other valuables. Complaint at ¶ 21 (annexed as Exhibit A to Declaration of Brian J. Farrar, dated November 14, 2014). Weinberger noticed man eyeing him as he left his apartment building and when he got near his car, he saw the man following him. *Id.* at ¶ 22. The man put a handkerchief over his face and drew a pistol as he approached, but Weinberger drove in reverse, knocked the robber down and sped off. *Id.* at ¶ 23. The robber then approached Chaskel Werzberger, who turned out to be a prominent Rabbi, warming up his car

---

[1] Plaintiffs cite herein to defendants' memorandum of law as "D. MOL at __".

nearby, shot him in the head, pulled him out of the vehicle and drove off. *Id.* at ¶ 24. The Rabbi died from his injuries. *Id.* NYPD Detectives Louis Scarcella and Stephen Chmil were assigned to the investigation of this case. *Id.* at ¶ 25.

Weinberger described the gunman to officers as being between 5'11" and 6'0" tall, with blonde hair, and shaven. Several other witnesses recalled that, prior to the crime, they saw two men in a station wagon parked nearby, one in the driver's seat and the other in the front passenger's seat. *Id.* at ¶ 26. Police officers learned of Thomas Joseph Astin as a suspect who fit this description through an anonymous telephone tip early on in the investigation; Astin died in a car crash while being pursued by police on April 2, 1990. *Id.* at ¶ 27.

In June 1990, Detectives Scarcella and/or Chmil interviewed Dmitry Drikman, a convicted rapist facing robbery charges. *Id.* at ¶ 28. Drikman led them to convicted robber and drug addict Alan Bloom, who was in jail facing charges that could send him to prison for life. *Id.* Detectives Scarcella and/or Chmil said that Bloom had admitted that he attempted to rob Weinberger with David Ranta. *Id.* at ¶ 29. Drikman and Bloom were then housed in the same cell together and subsequently Drikman also implicated David Ranta in the crime. Drikman's girlfriend was then interviewed and she told police she had seen David Ranta and Bloom plotting how to cover up the attempted robbery and murder. *Id.* at ¶ 30. Bloom testified against David Ranta only after being granted immunity for his involvement in the robbery and murder and a promise for a reduced sentence on his pending robbery charges. *Id.* at 31. While defendants were questioning Bloom and Drikman, both were allowed to leave jail, smoke crack cocaine and have sex with prostitutes in return for implicating David Ranta. *Id.* at ¶ 36.

Another supposed witness, Alison Picciano, told the police that David Ranta had admitted to her that he had pulled the Rabbi from his car and shot him while he was on the

ground. She received free hotel accommodations and meals and the promise that certain open criminal cases against her would be dismissed for her testimony. *Id.* at ¶ 35.

On August 13, 1990, Detectives Scarcella and Chmil arrested David Ranta in Brooklyn. *Id.* at ¶ 37. He was taken to a police station where Detectives Scarcella and/or Chmil and/or other police officers said that after initial denials, Ranta eventually admitted that he had been at the crime scene with Bloom and Drikman in a station wagon, which he believed Bloom had stolen, that he had known about a plan to rob a Jewish jewel courier and that he was to have been the "lookout" during the robbery. The Detectives said David Ranta said he saw Bloom and Drikman exchange a gun in the station wagon and that, before any of the crimes occurred, he had left the scene when Bloom and Drikman began arguing about which one of them was going to commit the actual robbery. *Id.* at ¶ 38.

David Ranta was placed in a lineup the following day before six witnesses. The first witness, Weinberger, the initial target of the robbery, did not recognize anyone. The next two witnesses identified someone other than David Ranta. *Id.* at ¶ 39. The fourth witness, who spoke only Yiddish and required an interpreter, initially said he didn't recognize anyone. The witness was then escorted to a nearby room with Detective Scarcella, a prosecutor and the interpreter. A tape recorder which was recording the lineup conversation was turned off and then turned back on as the witness said that, in fact, he had identified the man in position six—which was David Ranta. *Id.* at ¶ 40.

David Ranta went on trial in New York Supreme Court in May 1991. Bloom, Picciano, and others testified against David Ranta. Bloom told the jury that when he and Ranta met later in the day after the crime, David Ranta said, "Why did you leave me? I had to kill someone." Picciano testified that David Ranta told her, "I had to do what I had to do. I shot him." David

Ranta's statement to police, which portrayed him as an accomplice instead of the gunman, was presented to the jury as well. *Id.* at ¶ 44.

On May 22, 1991, Ranta was convicted by a jury and sentenced to 37 ½ years to life in prison. *Id.* at ¶ 45. His initial appeal was denied, but in 1996, Astin's wife signed a sworn affidavit saying that her husband, before he was killed in a car crash, had admitted that he killed the Rabbi. Despite this affidavit, Ranta's motion for a new trial was denied. *Id.* at ¶ 46.

In 2011, the Kings County District Attorney created a Conviction Integrity Unit began re-investigating David Ranta's case. *Id.* at ¶ 47. One of the witnesses who identified Ranta in the lineup said Detective Louis Scarcella coached him to pick Ranta. *Id.* at ¶ 48. Kings County prosecutor investigators also learned that while defendants were interrogating Bloom and Drikman, both were allowed to leave jail, smoke crack cocaine and have sex with prostitutes in return for implicating Ranta. *Id.* at ¶ 49. Drikman and his girlfriend also recanted their accounts that implicated Bloom and Ranta. *Id.* at ¶ 50. On March 21, 2013, the Kings County Supreme Court Justice Miriam Cyrulnik granted David Ranta's Motion to Vacate his conviction, which was not opposed by the King's County District Attorney's Office, Conviction Integrity Unit, and released him from incarceration. *Id.* at ¶ 51.

At the time of Mr. Ranta's arrest and incarceration, Patricia Ranta was married to David Ranta, and they were together an intimate family unit raising their children Nicholas, age 5, and Priscilla Ranta, age 2, in Brooklyn, New York. *Id.* at ¶ 52. Mr. Ranta spent over twenty-three years imprisoned for the crime, during which time plaintiffs were denied the right to intimate and familial association with him. *Id.* at ¶ 53.

As a result of their father' absence, Nicholas and Priscilla Ranta suffered the loss of society, companionship, advice, moral support, family services, attention, protection, parental

care, and financial support. As a result of her husband's absence, Patricia Ranta suffered the loss of society, companionship, advice, moral support, family services, attention, protection, spousal care, comfort, guidance, counsel and financial support. *Id.* at ¶ 67. Plaintiffs also suffered from severe emotional and mental anguish, bereavement, and the stigma of being the wife and children of a man who was tried and convicted of highly publicized murder of a beloved Rabbi. *Id.*

Defendants' conduct was purposefully directed at the relationship of plaintiffs with their husband and father, David Ranta, and caused them to doubt David Ranta's innocence. Had plaintiff's known the true nature of defendants' conduct as described herein, they would have assisted David Ranta in his effort to prove his innocence. *Id.* at ¶ 77. Defendants knew that plaintiffs' intimate family patriarch, David Ranta, was framed, falsely imprisoned, maliciously prosecuted, unfairly tried, and wrongfully convicted and incarcerated, carried out by defendants' malicious scheme to arrest of David Ranta, which they did on August 13, 1990, without justification or provocation, and without probable cause, indeed knowing that David Ranta did not murder the Rabbi. *Id.* at ¶ 78.

Defendants' above described acts effectively ended their intimate familial relationship with him. *Id.* at ¶ 81. Defendants' behavior was intentionally directed at the familial relationship (*id.* at ¶ 85), in particular to malign plaintiffs from David Ranta and alienate Plaintiffs from David Ranta during the investigation and incarceration. *Id.* at ¶ 83. Plaintiffs were deprived of the ability to assert timely state law claims against Defendants which they would have asserted but for Defendants acts described herein and the passage of time. *Id.* at ¶ 89.

The above conduct was not isolated. Since David Ranta was released, Detective Scarcella, who retired in 1999, has been exposed in the courts and in the media, including *The*

*New York Times*, which published an article accusing Scarcella of misconduct in many investigations: fabricating evidence, coercing witnesses and concealing evidence of defendants' innocence. *Id.* at ¶ 57. The Brooklyn Conviction Integrity undertook to re-investigate all 57 cases in which Detective Scarcella was involved, and dozens of other cases, mostly from the same time period. *Id.* at ¶ 58. Teresa Gomez, a crack addict, testified as an eyewitness in six separate murder cases involving Detective Scarcella. *Id.* at ¶ 59.

It was the practice and pattern of Detective Louis Scarcella and Stephen Chmil to fabricate confessions either by making them up entirely, as in the case of David Ranta, who claims that he never made any confession in his case, or by coercion using physical force, as alleged by Sundhe Moses, who was convicted for shooting a four year old to death in 1997. In a review of cases by the New York Times, it was reported that in at least five murder cases, suspects questioned by Scarcella began their confessions with either "you got it right" or "I was there". The confession attributed to David Ranta began "I was there." *Id.* at ¶ 60.

Robert Logan, found guilty in a 1997 killing investigated by Detective Scarcella, was recently freed from prison after a review by the Brooklyn District Attorney's Office, which found a major discrepancy in the story of a questionable eye witness who was released from prison on the day of the crime, and had this information been disclosed, would most likely not have been allowed to identify Logan in court. *Id.* at ¶ 61.

On May 6, 2014, Kings County District Attorney Ken Thompson announced that as a result of the Integrity Unit's investigation into Detective Scarcella, the murder convictions of Darryl Austin, Alvena Jennette and Robert Hill should be vacated and the charges dismissed. Thompson said in a statement that "based on a comprehensive review of these cases, it is clear

that testimony from the same problematic witness undermined the integrity of these convictions, and resulted in an unfair trial for each of these defendants." *Id.* at ¶ 62.

The Exoneration Initiative, a nonprofit group in Manhattan, has documented at least five cases of Detective Chmil's that raise significant questions and no other New York City detective's name appears more frequently than Mr. Chmil's in the Exoneration Initiative's caseload of 300 convictions that are deemed probably wrongful. *Id.* at ¶ 63. One of the most disturbing cases involving Detective Chmil is a case on which he was not teamed with Detective Scarcella. In 1985, Jeffrey Campbell, a crack addict, helped avoid jail by implicating club owner Valance Cole for a drug-related murder. However, in 1994, just before he died of AIDS, Campbell claimed that Detective Chmil had told him to frame Cole, and even gave him a script to read. Cole is still in prison. *Id.* at ¶ 64.

The City of New York and the NYPD knew, or in absence of their deliberate and conscious-shocking indifference should have known, that its police officers, including Detectives Scarcella and Chmil and John and Jane Doe Police Officers, maintained unconstitutional customs, policies and practices, including failing to abide by proper procedures, fabricating and coercing confessions, failing to investigate evidence and misrepresenting evidence of innocence, intentional coaching of witnesses to make false identifications, improper incentivizing the giving of false testimony, suppression of exculpatory evidence, and perjury at trial. *Id.* at ¶ 65.

Defendants' systematic misconduct caused plaintiffs to suffer a tragic deprivation of a husband and father who will never be the same. Defendants took David Ranta away from Plaintiffs, framed him for a murder he not commit, and locked him away for over 23 years, dramatically altering the course of Plaintiffs' lives and who they each are as human beings, all in

violation of their well-established constitutional rights to familial association and access to courts. *Id.* at ¶ 7.

## ARGUMENT

## POINT I

## LEGAL STANDARD FOR
## MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

A pleading must contain a "short and concise statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In accordance with this rule, to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must set out only enough facts to state a claim to relief that is plausible on its face." *Vaughn v. Air Line Pilots, Ass'n, Int'l*, 377 Fed. Appx. 88, 90 (2d Cir. N.Y. 2010) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). The factual content must be sufficient for the court, based upon "its judicial experience and common sense," to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 1949-50. In evaluating the plausibility of the complaint, the court must give the plaintiff the benefit of all reasonable inferences from the pleaded facts, which must be accepted as true. *Id.*; *Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565, 567 (2d Cir. 2011).

For the reasons set forth below, plaintiffs respectfully submit that, upon consideration of the record before the Court, defendants' motion to dismiss must be denied in its entirety.

## POINT II

## PLAINTIFFS STATE VALID CLAIMS FOR RELIEF UNDER 42 U.S.C. § 1983

Defendants assertion that plaintiffs' loss of familial association and denial of access to court claims must be dismissed because plaintiffs cannot demonstrate any actions of defendants "specifically directed at their relationship with David Ranta" is contrary to both fact and law. (D. MOL at 5).

**A.    Plaintiffs' Complaint Alleges Valid Familial Association Claims**

Defendants' removal of David Ranta from plaintiffs' lives by maliciously and wrongfully arresting, convicting and incarcerating him for murder was a dire violation of their well-recognized "right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Anthony v. City of New York*, 339 F.3d 129, 142-43 (2d Cir. 2003).

Defendants' unconstitutional interference with this substantive due process right of familial association precluded plaintiffs' "freedom of personal choice in matters of family life[,] one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Quilloin v. Walcott,* 434 U.S. 246, 255, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978). In *Roberts v. United States Jaycees*, 468 U.S. 609, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984), the Supreme Court explained that the *Bill of Rights* protects "certain kinds of highly personal relationships . . . from unjustified interference by the State." *Id. at 618*. The Court in *Roberts* acknowledged that "the personal affiliations that exemplify these considerations . . . are those that attend the creation and sustenance of a family . . . ." *Id.* at 619.

As such, a parent has a "fundamental liberty interest" in "the companionship and society of his or her child" and "the state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983." *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982)). "This constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) (overruled on other grounds by *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999)).

There can be no doubt that the acts and omissions of defendants which caused David Ranta to be separated from plaintiffs was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Anthony v. City of New York*, at 143 (2d Cir. N.Y. 2003). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998) (internal quotation marks omitted). Such conscience-shocking conduct can arise when it is intended to injure in some way unjustified by any government interest or because state officials acted with deliberate indifference that was shocking under the circumstances. *Id.* at 849-50.

Defendants, citing the Second Circuit in *Patel v. Searles*, acknowledge this Constitutional protection of familial relationships from unwarranted governmental interference. (D. MOL at 5 (citing *Patel v. Searles*, 305 F.3d 130, 135 (2d Cir. 2002)). Defendants argue, however, that plaintiffs' familial association claims must be dismissed because the actions of defendants described above, while not denying their shocking, arbitrary and egregious nature, were not "specifically targeted at plaintiffs" or their familial relationship with David Ranta. (D. MOL at 6-7 (citing *Kogut v. County of Nassau*, 2009 U.S. Dist. LEXIS 67940, at *44 (E.D.N.Y. Aug. 3, 2009))). The Second Circuit's unequivocal statement in *Patel* made clear, however, that "this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association." *Id.* at 137. Indeed, the Second Circuit there noted that this "***strict standard suggested by defendants . . . we do not believe finds support in Roberts or in any of our precedents . . . .***" *Id.* (emphasis added).

The City overly relies on *Kogut*, which dismissed the plaintiffs' familial association claims for failure to show defendants directed any shocking, arbitrary, or egregious conduct towards them as opposed to the wrongfully imprisoned person. *Kogut* is contrary to the Second Circuit's directive in *Patel* that such a strict standard finds no precedential support. Indeed, upon closer examination, the *Kogut* opinion misses the mark in purporting to consistently apply the Supreme Court's precedent in *County of Sacramento v. Lewis*, by latching onto the phrase there that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action ***most likely*** to rise to the conscience-shocking level." *Kogut v. County of Nassau*, at \*43-44 (quoting *Lewis,* 523 U.S. at 849 (1998) (emphasis added)). The *Kogut* decision required two leaps in reasoning to reach its result. First, instead of interpreting the phrase "intended to injure in some way" as the most extreme end of a spectrum of conduct, as obviously intended by the Supreme Court in *Lewis* (and as recognized in *Patel*), the *Kogut* decision set this most extreme example of conduct as the minimum requirement for finding due process deprivation of familial association. Second, the phrase "intended to injure in some way" does not necessarily mean, as *Kogut* interpreted it, "intended to injure the plaintiff in some way."

Indeed, the *Lewis* Court, in using the extreme "intentional injury" example, quoted its precedent in *Daniels v. Williams*, 474 U.S. 327, 331 (1986), that "[h]istorically, this guarantee of due process has been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." (emphasis in original). As the *Lewis* Court noted, "[i]n *Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205 (1952), the case in which we formulated and first applied the shocks-the-conscience test, it was not the ultimate purpose of the government actors to harm the plaintiff, but they apparently acted with full appreciation of what the Court described as the brutality of their acts." *Lewis*, 523 U.S. at 849, n.9.

The *Lewis* Court recognized that deliberate indifference "that shocks in one environment may not be so patently egregious in another." *Id.* at 850. However, the key to this distinction is, as the term would suggest, the ability to deliberate. Due process violations are much less likely to be found upon decisions and actions made "in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 853 (quoting *Whitley v. Albers*, 475 U.S 312, 320 (1986)). Thus, in the prisoner context for example, "liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.*

Here, defendants had extended opportunities to do better, but instead used those opportunities to perpetuate their truly shocking behavior, deliberately and consciously indifferent to plaintiffs' needless suffering. The other case cited by defendants, *McCray v. City of New York*, supports plaintiffs' position here that "deliberate indifference to their familial association rights" is all that is required to state a claim in the wrongful imprisonment context. 2007 U.S. Dist. LEXIS 90875, at *96 (S.D.N.Y. 2007). In *Dusenbury v. City of New York*, a case involving the unlawful stop and subsequent use of force against a father, the court held that his children could amend the complaint to assert a § 1983 familial association claim even if they failed to establish that the state action was directly aimed at the parent-child relationship. 1999 U.S. Dist. LEXIS 5039 (S.D.N.Y. Apr. 8, 1999).

In any event, contrary to defendants' argument (D. MOL at 7), the Complaint does identify specific, non-conclusory actions that were purposefully directed at the relationship of plaintiffs with their husband and father, David Ranta, to cause them to doubt his innocence.

Complaint at ¶77. Defendants' active concealment of their fabrication of evidence and false statements included the coaching of a key identification witnesses in a police lineup to falsely identify Ranta (Complaint at ¶ 48, 79, 88); improperly incentivizing the giving of false testimony by other key "witnesses" (one of whom has since recanted) by allowing them to leave jail, smoke crack cocaine and have sex with prostitutes in return for implicating Ranta (*id.* at ¶¶ 36, 40, 49, 50, 70, 88); suppression of exculpatory evidence (*id.* at 27, 36, 46, 48-50, 79), and perjury at trial (*id.* at ¶¶ 4, 79, 88). The Complaint asserts that had plaintiffs known the true nature of defendants' conduct as described herein, they would have had the meaningful opportunity to and would have assisted David Ranta in his effort to prove his innocence. *Id.* at ¶ 77. The scheme perpetrated by defendants, in particular Scarcella and Chmil, was intentionally directed at the familial relationship (*id.* at ¶ 85), in particular to malign plaintiffs from David Ranta and alienate Plaintiffs from David Ranta during the investigation and incarceration (*id.* at ¶ 83).

Clearly these actions by defendants were intended to conceal from the entire world, including plaintiffs, the true facts required to prove of his innocence. Unlike the rest of the world, plaintiffs' familial rights are protected from such intrusion.

B.    **Plaintiffs' Complaint Alleges Valid Claims for Denial of Access to Courts**

Plaintiffs' claims for deprivation of constitutional access to the courts are based on "backward-looking claims, which 'cover . . . specific cases that cannot now be tried (or tried with all material evidence) . . . .'" *Stevens v. Webb*, 2014 U.S. Dist. LEXIS 37874, 18-21 (E.D.N.Y. Mar. 21, 2014) (quoting *Christopher v. Harbury*, 536 U.S. 403, 413-14, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (1974)). While the Second Circuit recently noted the viability of this type of claim is not entirely clear, "[i]f recognized, [backward-looking claims] would be available only if the

government action caused the plaintiff's suit to be dismissed as untimely, . . . or if official misconduct was so severe as to render[] hollow his right to seek redress, . . . [such as] if a judicial remedy was completely foreclosed by false statement or nondisclosure." *Id.* at 19 (quoting *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012), in turn, citing, *inter alia, Swekel v. City of River Rouge*, 119 F.3d 1259, 1264 (6th Cir. 1997) (police cover-up extended throughout time to file suit under statute of limitations)).

"In general, a backward-looking claim must be predicated upon 'deliberate action to destroy evidence' or 'prevent plaintiff[] from obtaining evidence.'" *Id.* at 20 (quoting *Farella v. City of New York*, No. 05-CV-8264, 2007 U.S. Dist. LEXIS 63087, 2007 WL 2456886, at *8 (S.D.N.Y. Aug. 22, 2007)). As noted in *Stevens*, courts, guided by these principles, have found viable deprivation of access to court claims upon allegations that the government actively concealed involvement in a medical experiment resulting in a patient's death, *Barrett v. United States*, 798 F.2d 565, 575 (2d Cir. 1986), and alleging that City police officers "destroyed crime scene photographs, removed the victims' socks and shoes from the crosswalk, [and] intimidated witnesses" after another officer struck and killed plaintiffs with his car, *Small v. City of New York*, 274 F. Supp. 2d 271, 278 (E.D.N.Y. 2003), vacated and remanded on other grounds sub nom. *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005). *Id.* at 20.

Here, the Complaint is clear that plaintiffs' claim for denial of access to courts is based not on denial of the right to assert Constitutional rights as argued by defendants (D. MOL at 8), but, rather, time barred state law claims for "loss of consortium and marital benefits of Patricia Ranta and loss of consortium of Nicholas Ranta and Priscilla Ranta by reason of the false arrest and false imprisonment of David Ranta by the defendants and the municipal Defendants' negligent supervision, training, hiring, retention and/or discipline and failure to intervene;

Defendants' intentional and/or negligent infliction of emotional and mental pain, suffering and distress; and all other damages allowed by statute and case law and which would have been asserted by Plaintiffs but for Defendants acts described herein and the passage of time." Complaint at ¶ 89. *See Oliva v. Town of Greece,* 2014 U.S. Dist. LEXIS 166481, *12 (W.D.N.Y. Dec. 1, 2014) ("a right of access complaint must identify and plead the underlying cause of action that has been lost") (citing *Christopher,* 536 U.S. 417-18).

Defendants' active concealment of their fabrication of evidence and false statements which completely foreclosed plaintiffs' ability to bring these claims included the coaching of a key identification witnesses in a police lineup to falsely identify Ranta (Complaint at ¶ 48, 79, 88); improperly incentivizing the giving of false testimony by other key "witnesses" (one of whom has since recanted) by allowing them to leave jail, smoke crack cocaine and have sex with prostitutes in return for implicating Ranta (*id.* at ¶¶ 36, 40, 49, 50, 70, 88); suppression of exculpatory evidence (*id.* at 27, 36, 46, 48-50, 79), and perjury at trial (*id.* at ¶¶ 4, 79, 88).

Such intentional and malicious conduct interfered with and prevented plaintiffs from the discovery of the true facts of the nature of David Ranta's arrest and conviction, which if known, would have allowed them to exercise their constitutionally protected right of petition for redress of grievances and to institute an action in New York State court for the causes of action noted above.

Pursuant to §§ 50-e and 50-i, a plaintiff who asserts state law tort claims against a municipal entity or its employees must file a notice of claim against the City within ninety days of the occurrence giving rise to the claim, and commence the action within a year and ninety days. N.Y. Gen. Mun. Law §§ 50-e and 50-i. Under New York law, one claiming false arrest must show "that the defendant intentionally confined him without his consent and without

justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). On the facts above, David Ranta and plaintiff Patricia Ranta clearly had a state law claim for false arrest and loss of consortium. To the extent those claims accrued at the time of his detainment, it was not asserted due to defendants' wrongful concealment and fabrication of evidence and became time-barred, together with the derivative loss of consortium of plaintiffs. *Rothfarb v. Brookdale Hosp.*, 139 A.D.2d 720, 722, 527 N.Y.S.2d 473, 475 (2d Dep't 1988) (a "loss of consortium. . . cause of action. . . is a derivative one, . . ., and thus is governed by the same period of limitations which controls the underlying cause of action") (citations omitted).[2]

### POINT III

### DEFENDANTS CHMIL AND SCARCELLA ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The Complaint alleges that defendants Scarcella and Chmil knowingly coerced, incentivized, and coached witnesses into giving false testimony, manufactured evidence, and concealed exculpatory evidence, resulting in plaintiffs' deprivation of familial relations with David Ranta and denial of access to courts. *See* Complaint at ¶¶ 4, 36, 40, 48, 49, 50, 70, 79, 88. On these facts, the individual defendants are not entitled to qualified immunity.

For a constitutional right to be clearly established for purposes of a qualified immunity defense, the precise conduct at issue need not previously have been ruled unlawful; but in light of pre-existing law the unlawfulness must be apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (U.S. 1987) (citations omitted). "It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."

---

[2] To the extent that David Ranta's state law claims for, *inter alia*, false arrest and wrongful imprisonment claim accrued upon his release on March 21, 2013, plaintiffs respectfully seek leave to move to amend the complaint to include state law claims as both David Ranta and plaintiffs filed timely notices of claim alleging state law claims and loss of consortium, and plaintiffs timely commenced this action within one year and 90 days on June 18, 2014.

*Zahrey v. Coffee*, 221 F.3d 342, 355 (2d Cir. 2000) (citing *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988) (other citations omitted). The Court in *Zahrey* found that right to have been clearly established in 1996, and by citation to *White*, it recognized that right had been established since at least 1988. *Id.* "[I]t was also then well established that for purposes of actions under section 1983 . . . , a person is 'responsible for the natural consequences of his actions[.]'" *Id.* at 357 (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)).

Here, as set forth above in Point II.A., *supra*, defendants Scarcella and Chmil caused plaintiffs to be deprived of their well established liberty interest in familial association with David Ranta based on false and fabricated evidence. *See id.* at 351 (noting the "need to determine whether the deprivation of liberty may be considered a legally cognizable result of the initial misconduct.") "Qualified immunity does not protect those who knowingly violate the law." *Marshall* v. *Sullivan,* 105 F.3d 47,53-54 (2d Cir. 1996) (internal citations and quotations omitted).

## POINT IV

### PLAINTIFFS STATE A CLAIM FOR MUNICIPAL LIABILITY

To prevail against a municipality in a Section 1983 action, a plaintiff must plead and prove three elements: (1) an official policy, practice, or custom that (2) caused the plaintiff to be subjected to (3) a denial of a constitutional right. *See Hartline v. Gallo*, 546 F.3d 95, 103 (2d Cir. 2008); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1977). "Local governing bodies . . . may be sued for constitutional deprivations pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91 (citations omitted).

It is sufficient to show a widespread pattern of behavior that constitute a "custom or usage with the force of law" or "the constructive acquiescence of senior policy-making officials." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citations omitted). "A policy, custom, or practice may also be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Id. at* 226 (citation omitted).

As set forth above in Point II, *supra*, plaintiffs have sufficiently pled underlying constitutional violations, and taking all facts alleged in the Complaint to be true, plaintiffs have sufficiently pled their *Monell* claims to withstand defendants' motion to dismiss. Plaintiffs assert that the NYPD created a policy or custom of failing to properly hire, supervise, control, train, monitor, discipline and/or investigate its employees, including Scarcella and Chmil, and under which these violations occurred (Complaint at ¶55-56), and identify several bases for that assertion, including that:

- The Brooklyn Conviction Integrity undertook to to re-investigate all 57 cases in which Detective Scarcella was involved, and dozens of other cases, mostly from the same time period. *Id.* at ¶ 58.
- Teresa Gomez, a crack addict, testified as an eyewitness in six separate murder cases involving Detective Scarcella. *Id.* at ¶ 59.
- It was the practice and pattern of Detective Louis Scarcella and Stephen Chmil to fabricate confessions either by making them up entirely, or by coercion using physical force, as alleged by Sundhe Moses, who was convicted for shooting a four year old to death in 1997. In a review of cases by the New York Times, it was reported that in at least five murder cases, suspects questioned by Detective Scarcella began their confessions with either "you got it right" or "I was there". The confession attributed to David Ranta began "I was there." *Id.* at ¶ 60.
- Robert Logan, found guilty in a 1997 killing investigated by Detective Scarcella, was recently freed from prison after a review by the Brooklyn District Attorney's Office, which found a major discrepancy in the story of a questionable eye witness who was released from prison on the day of the crime, and had this information been disclosed, would most likely not have been allowed to identify Logan in court. *Id.* at ¶ 61.
- On May 6, 2014, Kings County District Attorney Ken Thompson announced that as a result of the Integrity Unit's investigation into Detective Scarcella, the

murder convictions of Darryl Austin, Alvena Jennette and Robert Hill should be vacated and the charges dismissed. Thompson said in a statement that "based on a comprehensive review of these cases, it is clear that testimony from the same problematic witness undermined the integrity of these convictions, and resulted in an unfair trial for each of these defendants." *Id.* at ¶ 62.

- The Exoneration Initiative's documentation of at least five cases of Chmil's that raise significant questions and no other New York City detective's name appears more frequently than Chmil's in the Initiative's caseload of 300 convictions that are deemed probably wrongful. *Id.* at ¶ 63. In 1985, Jeffrey Campbell, a crack addict, helped avoid jail by implicating club owner Valance Cole for a drug-related murder. However, in 1994, just before he died of AIDS, Campbell claimed that Detective Chmil had told him to frame Cole, and even gave him a script to read. Cole is still in prison. *Id.* at ¶ 64.

The City of New York and the NYPD knew, or in absence of their deliberate and conscious-shocking indifference should have known, that its police officers, including Detectives Scarcella and Chmil and John and Jane Doe Police Officers, maintained unconstitutional customs, policies and practices, including failing to abide by proper procedures, fabricating and coercing confessions, failing to investigate evidence and misrepresenting evidence of innocence, intentional coaching of witnesses to make false identifications, improper incentivizing the giving of false testimony, suppression of exculpatory evidence, and perjury at trial. *Id.* at ¶65. These policies and customs caused plaintiffs injuries. *Id.* at ¶¶66-67.

Such allegations squarely satisfy the pleading requirements for a *Monell* claim and show a widespread pattern of policy making officials' acquiescence in the constitutional violations of, and failure to train, supervise and/or discipline detectives, in particular Scarcella and Chmil. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citations omitted). At the very least, the allegations of the complaint support the inference that the City and NYPD's policy, custom, or practice of failure to train and supervise its employees display a deliberate indifference to the constitutional rights of those within its jurisdiction. *Id.* at 226.

## CONCLUSION

Based on the foregoing, plaintiffs respectfully request that defendants' motion to dismiss the Complaint be denied in its entirety and that plaintiffs be awarded such other and further relief as the Court deems just a proper.

Dated: New York, New York
December 5, 2014

Respectfully submitted,

/s/ Peter C. Dee
Peter C. Dee
Mavronicolas & Dee LLP
415 Madison Avenue, 18th Floor
New York, New York 10017
(646) 770-1256
pdee@mavrolaw.com

*Attorneys for Plaintiffs Patricia Ranta,
Nicholas Ranta, and Priscilla Ranta*