UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PATRICIA RANTA, et al.,

                    Plaintiffs,

  -against-

THE CITY OF NEW YORK, et al.,

                    Defendants.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**

14-CV-3794 (SLT)(LB)

**TOWNES, United States District Judge:**

    Plaintiffs Patricia Ranta, Nicholas Ranta, and Priscilla Ranta filed this case in June 2014 alleging claims pursuant to 42 U.S.C. § 1983. Their claims arise from the wrongful conviction of David Ranta, Patricia's ex-husband and Nicholas and Priscilla's father. Plaintiffs claim that Defendants deprived them of their constitutionally protected rights to familial association and access to the courts. Presently before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 11.) For the reasons set forth below, Defendants' motion is granted in part.

## I. BACKGROUND

### A. Factual Background

    At approximately 5:30 a.m. on the morning of February 8, 1990, a jewelry courier named Chaim Weinberger left his Williamsburg, Brooklyn apartment carrying a suitcase full of diamonds. (Compl. ¶ 21, ECF No. 1.) Weinberger noticed a tall blond man following him as he walked from his apartment to his car. (*Id.* ¶ 22.) The blond man then concealed his face with a handkerchief, approached Weinberger, and drew a pistol. (*Id.* ¶ 23.) Having spotted the would-be robber, Weinberger got into his car, used it to knock down the blond man, and drove away. (*Id.* ¶¶ 22–23.) The frustrated attacker noticed another man warming up his car nearby, shot the

man in the head, pulled him from the car, and drove off. (*Id.* ¶ 24.) The man he shot was Rabbi Chaskel Werzberger, a 56-year old Auschwitz survivor and prominent community leader. (*Id.*) Werzberger later died from his injuries. (*Id.*)

Six months after the attack, on August 13, 1990, NYPD detectives Louis Scarcella and Stephen Chmil arrested David Ranta for Rabbi Werzberger's murder. (*Id.* ¶ 37.) Two witnesses—both facing serious charges themselves—had led the detectives to Ranta. (*Id.* ¶¶ 28-30.) Upon arresting Ranta, the detectives took him to the police station where, after initial denials, he allegedly admitted that he had been at the crime scene and been involved in planning the attempted robbery. (*Id.* ¶ 38.) The next day, detectives placed Ranta in a lineup. (*Id.* ¶ 39.) The first witness—Weinberger—did not identify anyone. (*Id.* ¶ 39.) Three witnesses identified someone other than David Ranta. (*Id.* ¶¶ 39, 41.) One witness identified David Ranta. (*Id.* ¶ 41.) Another witness, a man who spoke only Yiddish, initially did not identify anyone. (*Id.* ¶ 40.) This witness then identified David Ranta after a discussion with Scarcella, a prosecutor, and an interpreter in a nearby room. (*Id.*) Although a tape recorder had been recording the lineup conversation, it was turned off and only turned back on when the witness identified Ranta. (*Id.*) A second lineup was held later that day; all three witnesses identified Ranta. (*Id.* ¶ 42.)

The case went to trial in May 1991. (*Id.* ¶ 44.) The trial judge criticized detective Scarcella for failing to record David Ranta's confession and failing to take notes of his conversations with two key witnesses. (*Id.*) Weinberger, the jewelry courier, testified that David Ranta was not the gunman. (*Id.*) Nonetheless, the trial ended with a conviction, and David Ranta was sentenced to 37 and 1/2 years to life in prison. (*Id.* ¶ 45.)

At the time of his arrest and conviction, David Ranta had been living in Brooklyn with his wife, Patricia, and their two children, Nicholas and Priscilla. (*Id.* ¶ 52.) Patricia divorced David in or about 2005, while he was in prison. (*Id.* ¶ 54.)

In 2011, the Kings County District Attorney's Office's Conviction Integrity Unit re-examined David Ranta's case. (*Id.* ¶ 47.) The investigation raised additional questions about the detectives' investigation and the witnesses used against Ranta. For example, a witness who identified Ranta in one of the lineups said detective Scarcella coached him to pick Ranta. (*Id.* ¶ 48.) Investigators also found that, during an interrogation of two witnesses, detectives Chmil and Scarcella allowed the witnesses to leave jail, smoke crack cocaine, and have sex with prostitutes in exchange for implicating Ranta. (*Id.* ¶ 49.) Further, two witnesses who had implicated Ranta recanted their testimony. (*Id.* ¶ 50.)

Even before the Conviction Integrity Unit began re-examining the case, an anonymous tip had produced another suspect, a man named Thomas Joseph Astin. (*Id.* ¶ 27.) Astin admitted to his wife that he killed a man during a botched attempt to rob a jewelry courier in Brooklyn on February 8, 1990. (*Id.* ¶ 46.) Although Astin died in a car crash during an April 1990 police chase, his wife signed an affidavit in 1996 recounting his confession. (*Id.*) Ultimately, on March 21, 2013, Kings County Supreme Court Justice Miriam Cyrulnik granted David Ranta's unopposed motion to vacate his conviction. (*Id.* ¶ 51.)

### B. Procedural History

Plaintiffs filed their Complaint on June 18, 2014, against the City of New York; the NYPD; NYPD detectives Louis Scarcella and Stephen Chmil (in their individual and official capacities); and John and Jane Doe Police Officers 1–15. (ECF No. 1.) The Complaint alleges claims pursuant to 42 U.S.C. § 1983 for violations of Plaintiffs' constitutionally protected rights

-3-

to familial association and access to the courts stemming from the wrongful conviction of non-party David Ranta.

On December 19, 2014, Defendants City of New York, NYPD, and Stephen Chmil filed this motion to dismiss for failure to state a claim upon which relief can be granted. (ECF No. 11.) Defendant Louis Scarcella, with this Court's leave, joined in this motion. (ECF Nos. 10, 14.) Defendants argue that Plaintiffs' familial association claim fails because the Complaint does not allege that Defendants purposely directed any conduct at the familial relationship. Chmil and Scarcella argue that they are, in any case, entitled to qualified immunity on this claim. Defendants next argue that Plaintiffs' denial-of-access claim fails because the Complaint does not adequately plead any viable underlying injury. Finally, Defendants argue that Plaintiffs' *Monell* claim fails for lack of an underlying constitutional violation. Defendants alternatively argue that the Complaint does not adequately plead a *Monell* claim.

## II. LEGAL STANDARD

Courts may grant a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) only where the complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In deciding such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Further, "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

## III. DISCUSSION

"Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing 42 U.S.C. § 1983). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Id.* (citation omitted). Here, Plaintiffs allege that Defendants violated their constitutionally protected rights to familial association and access to the courts.

### A. Familial Association

In *Roberts v. United States Jaycees*, the Supreme Court addressed two associational rights: expressive association, which protects an individual's "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion," and intimate association, which includes the right to "enter into and maintain certain intimate human relationships." 468 U.S. 609, 617–18 (1984). Plaintiffs claim that Defendants violated their right to intimate association[1] as protected by the First and Fourteenth Amendments. "The source of the intimate association right has not been authoritatively determined." *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999). However, because Plaintiffs' claim does not implicate any First Amendment concerns, their claim seems to fit under the Fourteenth Amendment. *See Patel v. Searles*, 305 F.3d 130, 135 (2d

---

[1] Courts have referred to this right as both the right to familial association and the right to intimate association. *See, e.g., Patel v. Searles*, 305 F.3d 130, 137, 139 (2d Cir. 2002) (using both labels). This Memorandum and Order uses both terms interchangeably.

-5-

Cir. 2002) (noting that the Supreme Court, citing "a number of substantive due process cases," has recognized the right as protected "as a fundamental element of personal liberty"); *Campos v. Weissman*, No. 9:07-CV-1263, 2009 WL 7771872, at *5 (N.D.N.Y. Sept. 10, 2009) ("Generally, courts . . . seem to agree that intimate association claims related to . . . familial relationships fall under the liberty interests protected by the Substantive Due Process component of the Fourteenth Amendment.").

The United States Court of Appeals for the Second Circuit has held that family members have, "in general terms, a substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state.'" *Anthony v. City of New York*, 339 F.3d 129, 142–43 (2d Cir. 2003) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999)). Government action violates this right only where it is "'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Id.* at 143 (quoting *Tenenbaum*, 193 F.3d at 600).

The Second Circuit has not explicitly decided whether only conduct that is specifically targeted at the familial relationship violates the right to familial association. However, the Second Circuit briefly addressed this point in *Patel*. That case arose out of the murder of the plaintiff's mother and sister. *Patel*, 305 F.3d at 134. After two months of investigating yielded little progress, the police defendants focused their investigation on the plaintiff. *Id.* The defendants disseminated false information about the plaintiff "to create hostility and mistrust among the members of his family towards him with the hope that the resulting animosity would produce accusations against him." *Id.* The officers drafted fake confession letters, which they mailed to two daily newspapers and the plaintiff's father. *Id.* One defendant visited the plaintiff's home and delivered a letter falsely accusing the plaintiff of murder to the plaintiff's

-6-

wife. *Id.* While delivering the letter, the defendant warned the plaintiff's wife that her and her children's lives were in danger. *Id.* Because of the defendants' actions, the plaintiff was ostracized from his family, and his father and siblings refused to talk to him. *Id.* The plaintiff brought a claim alleging violation of his right to intimate association, and the defendants moved for judgment on the pleadings. *Id.* at 133.

The defendants in *Patel* argued that plaintiff's intimate association claim must fail because the officers' actions were not "directed at" the plaintiff's family relationships. *Id.* at 137. The Second Circuit noted, however, that it "has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association." *Id.* (citation omitted). Moreover, it expressed doubt that such a strict standard could find support in *Roberts* or any Second Circuit precedent. *Id.* Nonetheless, the Second Circuit found that even if such a strict standard did apply, the plaintiff had "alleged facts sufficient to prove that the officers' conduct *was* intentionally directed at his family." *Id.* (emphasis in original). Thus, *Patel* did not finally resolve this point.

District courts considering the issue have reached differing results. *See McCants v. City of Newburgh*, No. 14 CV 556(VB), 2014 WL 6645987, at *2 (S.D.N.Y. Nov. 21, 2014) (citing cases). Defendants encourage this Court to adopt the reasoning of the district court in *Kogut v. County of Nassau*, No. 06-CV-6695(JS)(WDW), 2009 WL 2413648 (E.D.N.Y. Aug. 3, 2009). *Kogut* arose from the prosecutions and convictions of a group of men for the rape and murder of a sixteen-year-old girl in 1984. *Id.* at *2–4. A few months after the victim's body was discovered, police questioned a suspect with a history of psychological illness. *Id.* at *2. That suspect identified another man, Restivo. *Id.* Police questioned Restivo for 24 hours, during which they "refused to let him leave the interrogation room, denied his request to contact a

lawyer or his girlfriend, and employed coercive and abusive interrogation tactics in order to produce false accusations against" another man, Halstead. *Id.* After enduring additional physical and emotional abuse, Restivo signed a written confession falsely implicating Halstead. *Id.* Police, again using "abusive and coercive tactics," extracted a coached confession implicating Halstead from a third man. *Id.* at \*3. In December 1986, Halstead was convicted of rape and murder and sentenced to 33 and 1/3 years to life in prison. *Id.* Nearly twenty years later, Halstead's conviction was vacated on the basis of negative DNA tests. *Id.* at \*4. Halstead's children then asserted a cause of action alleging an unconstitutional violation of their right to familial association. *Id.* at \*1.

The defendants moved for judgment on the pleadings against Halstead's children's intimate association claim. *Id.* at \*1. The court granted that motion on the basis that, unlike in *Patel*, the defendants "did not direct any 'shocking, arbitrary, or egregious' conduct toward Halstead's Children." *Id.* at \*14–15 (quoting *Anthony*, 339 F.3d at 143). The *Kogut* court also cited the following language from the Supreme Court:

> [T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

Defendants ask this Court to dismiss Plaintiffs' intimate association claim for substantially the reasons stated by the court in *Kogut*. That is, Defendants argue that the Defendants' actions, as alleged, did not directly target the Rantas' familial relationship and thus did not violate Plaintiffs' right to intimate association. Defendants also argue that Chmil and

-8-

Scarcella are, in any case, entitled to qualified immunity. A number of courts have "bypassed the question of intentional interference by determining conduct not directed at the integrity of the family unit is not clearly unlawful, entitling defendant police officers to qualified immunity." *McCants v. City of Newburgh*, No. 14 CV 556(VB), 2014 WL 6645987, at *3 (S.D.N.Y. Nov. 21, 2014) (citations omitted). Like those courts, this Court finds that it need not reach the question of intentional interference because Chmil and Scarcella are entitled to qualified immunity.

### 1. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

"Because qualified immunity is an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (citation and internal quotation marks omitted). Thus, the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 232 (citation and internal quotation marks omitted). However, when defendants raise qualified immunity on a motion to dismiss, they "must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). At this stage, "the

plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

The qualified immunity inquiry consists of two parts: "whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'"[2] *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). The Supreme Court has instructed that

> [t]o be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate. . . . [T]he right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official.

*Reichle v. Howards*, 132 S. Ct. 2088, 2093–94 (2012) (citations and internal quotation marks omitted) (second alteration in original). In determining whether a right qualifies as clearly established, the Second Circuit "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted). "[T]he conduct need not be previously deemed unlawful, but the unlawfulness, in light of pre-existing law . . . must be apparent." *Wagner v. Swarts*, 827 F. Supp. 2d 85, 101 (N.D.N.Y. 2011) (citation and internal quotation marks omitted), *aff'd*, 489 F. App'x 500 (2d Cir. 2012).

The Second Circuit has confirmed that "at least the general right to intimate association has been clearly established since 1984 when *Roberts* was decided."[3] *Patel*, 305 F.3d at 139.

---

[2] Courts may exercise discretion in deciding the order in which to conduct the qualified immunity analysis. *See Pearson*, 555 U.S. at 236.

[3] Plaintiffs argue that the qualified immunity inquiry centers on the right not to be deprived of liberty on the basis of false evidence fabricated by a government officer. (Mem. Opp. 17–18, ECF

But qualified immunity does not turn on general propositions. Rather, the essential question is whether, in 1990, the right was established "in a particularized sense so that the contours of the right [would have been] clear to a reasonable official." *See Reichle*, 132 S. Ct. at 2094 (citation and internal quotation marks omitted).

In *Patel* the Second Circuit "acknowledged uncertainty as to the contours of the right [to intimate association]," but held that "that uncertainty does not extend so far as to suggest that a murder investigation erodes all of the 'critical buffers between the individual and the power of the State.'" *Patel*, 305 F.3d at 139 (quoting *Roberts*, 468 U.S. at 619). Thus, the circuit found that "it would [not] be objectively reasonable for the police to engage in an extended public and private defamatory misinformation campaign to destroy a family, hoping that those tactics *might* produce incriminating leads in a murder investigation." *Id.* at 140 (citation omitted). The Second Circuit in *Patel* thus held that the officers who intentionally directed their conduct at the plaintiff's familial relationship were not entitled to qualified immunity. *Id.*

---

No. 12.) Plaintiffs cite *Zahrey v. Coffey*, 221 F.3d 342, 356 (2d Cir. 2000), in support of their argument that that right has been clearly established since at least 1988. *Zahrey* was a *Bivens* action arising from an alleged conspiracy to manufacture evidence against the plaintiff, resulting in the plaintiff's incarceration for eight months before he was acquitted at trial. 221 F.3d 344–46. The liberty deprivation in *Zahrey* was the plaintiff's incarceration. *Id.* at 348. Here, Plaintiffs allege that the detectives' actions affected their familial relationship and violated their right to intimate association. Courts faced with similar facts have framed their qualified immunity analyses under the right to intimate association. *See, e.g., Patel*, 305 F.3d at 138–40; *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 468–473 (S.D.N.Y. 2012). Further, to the extent Plaintiffs argue that a violation of David Ranta's right not to be deprived of liberty on the basis of false evidence fabricated by a government officer precludes Chmil and Scarcella from receiving the protection of qualified immunity on Plaintiffs' intimate association claim, that argument lacks merit. *See Deskovic*, 894 F. Supp. 2d at 473 n.38 (rejecting argument that "because the defendants had violated *any* constitutional rights of *any* plaintiffs, qualified immunity was inappropriate on all claims by all plaintiffs"); *McGarr v. City of Peekskill*, 975 F. Supp. 2d 377, 390 (S.D.N.Y. 2013) (rejecting plaintiff's argument that defendant police officers could not benefit from qualified immunity on plaintiff's familial association claim based on officers' clearly unconstitutional actions as to plaintiff's son). Accordingly, like the Second Circuit in *Patel* and the Southern District of New York in *Deskovic*, this Court will frame its qualified immunity analysis around the right to intimate association.

Here, however, the Complaint does not include allegations that Chmil and Scarcella's conduct intentionally targeted the Rantas' familial relationship. Rather, the Complaint includes allegations of wrongful conduct directed at David Ranta. For example, the Complaint alleges that Chmil and Scarcella: coached a key identification witness to pick David Ranta out of a lineup (compl. ¶¶ 48, 88); improperly incentivized a witness to give false testimony against David Ranta (*id.* ¶ 79); suppressed exculpatory evidence (*id.*); perjured themselves at David Ranta's trial (*id.* ¶¶ 79, 88); and allowed two witnesses to leave jail in order to smoke crack cocaine and have sex with prostitutes in exchange for implicating David Ranta (*id.* ¶¶ 36, 49). Although Plaintiffs allege that Chmil and Scarcella acted intentionally, (*id.* ¶ 85), the Complaint includes only allegations of conduct directed at David Ranta that have only an incidental effect on Plaintiffs' familial relationship. Chmil and Scarcella's conduct thus does not fall within the category of behavior that the Second Circuit held in *Patel* undoubtedly constitutes a violation of the right to intimate association. Given the lack of guiding caselaw from the Second Circuit or the Supreme Court, and the split among other circuits, *see Deskovic*, 894 F. Supp. 2d at 470–71, 472 n.37 (citing cases), this Court finds that the detectives' actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). *See also Deskovic*, 894 F. Supp. 2d at 472–73 (finding that "anything less than conduct intentionally directed at the familial relationship was not clearly established as unlawful within the Second Circuit . . . in 1990" and thus holding that police defendant was entitled to qualified immunity on familial association claim).

## B. Access To The Courts

Plaintiffs' also assert a claim for violation of their right of access to the courts. Specifically, Plaintiffs claim that Defendants' actions prevented them from timely asserting state-law claims including, but not limited to, loss of consortium and marital benefits (Patricia); loss of consortium (Nicholas and Priscilla); and intentional or negligent infliction of emotional and mental pain, suffering, and distress (Patricia, Nicholas, Priscilla).

The Supreme Court and Courts of Appeals have recognized two categories of denial-of-access claims. *See Christopher v. Harbury*, 536 U.S. 403, 412–13 (2002). The first, forward-looking category involves "claims that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Id.* at 413. The second category, at issue here, "covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future."[4] *Id.* at 413–14 (internal footnote omitted). The Supreme Court further described the backward-looking category:

> The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, *e.g.*, *Foster v. Lake Jackson*, 28 F.3d 425, 429 (C.A.5 1994); *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (C.A.7 1984) ("[T]he cover-up and resistance of the investigating police officers rendered hollow [the plaintiff's] right to seek redress"), the loss of an opportunity to sue, *e.g.*, *Swekel v. River Rouge*, 119 F.3d 1259, 1261 (C.A.6 1997) (police coverup extended throughout "time to file suit . . . under . . . statute of limitations"), or the loss of an opportunity to seek some particular order of relief, as Harbury alleges here. These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future.

---

[4] The Supreme Court noted, however, that all such cases have been decided in the Courts of Appeals and assumed, without deciding, the correctness of those decisions.

*Id.* at 414 (internal footnotes omitted).

"The viability of backward-looking right-of-access claims is far from clear in this Circuit." *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012). The precise elements of such a claim are therefore uncertain. *Jean-Laurent v. Lawrence*, No. 12-CV-1502 (JPO), 2015 WL 1208318, at *4 (S.D.N.Y. Mar. 17, 2015). It is clear, however, that denial-of-access claims are "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415; *see also Sousa*, 702 F.3d at 128 (citation omitted). Thus, at the very least, plaintiffs asserting a right-of-access claim "must identify a 'nonfrivolous,' 'arguable' underlying claim . . . [and] the complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued."[5] *Harbury*, 536 U.S. at 415–18 (internal footnote omitted).

Defendants argue that Plaintiffs' denial-of-access claim fails for want of a viable underlying claim. In support of their argument, Defendants point out that David Ranta filed a notice of claim against the same Defendants in this case in May 2013 and settled all of his claims by signing a general release in February 2014. (Reply 5, ECF No. 13.) Defendants argue that, because Plaintiffs' state-law claims are derivative, David Ranta's settlement and general release extinguished these claims. (*Id.* 4 (citing *Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 606 (E.D.N.Y. 2011)).

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may only consider:

> (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose

---

[5] Plaintiffs do not dispute that they must plead the underlying cause of action. (Mem. Opp. 16, ECF No. 12.)

terms and effect the complaint relies heavily, *i.e.*, documents that are "integral" to the complaint.

*Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (internal citations omitted). "Materials not falling within any of the categories enumerated above are deemed 'matters outside the pleading' for purposes of Fed. R. Civ. P. 12(b)." *Id.* When such matters are "presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citation and internal quotation marks omitted). The conversion requirement is "strictly enforced" in this circuit. *Id.*

Here, Defendants attach David Ranta's notice of claim and general release and "submit"—without any analysis or citation to supporting caselaw—that this Court may take judicial notice of these documents as matters of public record.[6] (Reply 5 n.2, ECF No. 13.) However, courts within the Second Circuit disagree as to whether notice-of-claim documents constitute public records of which courts may take judicial notice. *Bejaoui v. City of New York*, No. 13-CV-5667 (NGG)(RML), 2015 WL 1529633, at *6 (E.D.N.Y. Mar. 31, 2015) (citations omitted). And while a court may take judicial notice of a general release and consider it on a motion to dismiss where the general release "has been filed with a court and is a matter of public record," *Muhammad v. Schriro*, No. 13-CV-1962 PKC, 2014 WL 4652564, at *3 (S.D.N.Y. Sept. 18, 2014) (citation omitted), there is no indication that the general release attached by the Defendants meets this standard. Rather, Defendants have simply attached an unauthenticated copy of the general release to their Reply. Courts have declined to take judicial notice on similar

---

[6] The Complaint does not attach these documents, incorporate them by reference, or rely heavily upon these documents, and Defendants do not claim that it does.

-15-

facts. *See id.* (citation omitted); *Calcutti*, 273 F. Supp. 2d at 498–99 (finding that judicial notice was inappropriate where unauthenticated general release was attached to reply and beyond the complaint's allegations); *see also* Fed. R. Evid. 201. This Court therefore declines to take judicial notice of the notice of claim and general release and will instead convert the portion of Defendants' motion to dismiss addressing Plaintiffs' denial-of-access claim into a motion for summary judgment pursuant to Rule 12(d). Accordingly, the parties will be permitted to present all materials pertinent to the motion within 30 days of the entry of this Memorandum and Order.

### C. The NYPD Does Not Constitute A Suable Entity

Finally, Defendants argue that the NYPD must be dismissed from this case because the NYPD does not constitute a suable entity. This Court agrees.

The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter § 396. The NYPD thus does not constitute a suable entity. *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (noting that the NYPD is not a suable entity). Plaintiffs' claims against the NYPD are therefore dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (ECF No. 11) is granted in part. Plaintiffs' familial association claim is dismissed as are all claims as against the NYPD. However, because Defendants have raised matters outside of the pleadings regarding Plaintiffs' denial-of-access claim, the Court will convert that portion of the motion to one for summary judgment and permit the parties to submit any pertinent material within 30 days of entry of this Memorandum and Order. *See* Fed. R. Civ. P. 12(d). The Court will defer ruling on the portion of Defendants' motion addressing Plaintiffs' *Monell* claims.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: September 30, 2015
Brooklyn, New York