**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
PATRICIA RANTA, NICHOLAS RANTA, and
PRISCILLA RANTA,

|  |  |  |
|---|---|---|
| | Plaintiffs, | 14 Civ. 3794 (FB)(LB) |
| Against | | **AMENDED**<br>**COMPLAINT** |
| THE CITY OF NEW YORK, NEW YORK CITY<br>POLICE DEPARTMENT, and LOUIS SCARCELLA,<br>and STEPHEN CHMIL, individually and as<br>Members of the New York City Police Department,<br>and JOHN AND JANE DOE POLICE OFFICERS<br>#1-15, | | **JURY TRIAL DEMANDED** |
| | Defendants. | |

------------------------------------------------------------------X

  Plaintiffs, Patricia Ranta, Nicholas Ranta, and Priscilla Ranta, by their attorneys,

Mavronicolas & Dee LLP, respectfully state as follows:

<b>NATURE OF ACTION</b>

  1.  This is a civil rights action against the City of New York ("City") based on and

arising out of the wrongful acts and omissions of the New York City Police Department

("NYPD") and against named and unnamed individual employees and agents of the NYPD, in

which the plaintiffs seek relief for the violation of their civil rights secured by 42 U.S.C. § 1983,

of their rights secured by the First and Fourteenth Amendments to the United States Constitution,

and of their rights secured under the laws and Constitution of the State of New York.

  2.  Patricia Ranta is the former wife of David Ranta, and together they are the natural

parents of Nicholas and Priscilla Ranta. Plaintiffs seek monetary damages, both compensatory

and punitive, an award of costs and attorneys' fees, and such other and further relief as this Court

deems just and proper, for being deprived of their intimate familial relations with David Ranta,

who was maliciously and despotically torn away from them and wrongfully imprisoned for over twenty-three years for a highly publicized murder that he did not commit. Plaintiffs were branded as the family of a murderer and deprived of the love and affection of their husband and father and have suffered their own independent injuries.

3.     The tragic history of this action dates to February 8, 1990, when an armed assailant killed the prominent Rabbi Chaskel Werzberger during a botched robbery of a jewelry courier in the Williamsburg neighborhood of Brooklyn, New York. Over six months later, the pressure on police to solve this brutal murder was great and NYPD Detectives Louis Scarcella and Stephen Chmil conspired to unlawfully place David Ranta under arrest in Brooklyn, New York without any reasonable suspicion or probable cause, on or about August 13, 1990.

4.     The awesome resources of the New York City Police Department and the Kings County District Attorney's Office were fixed on convicting David Ranta. In the six months prior to David Ranta's arrest and leading up to and including his criminal trial, Detectives Scarcella and Chmil, and other employees of the NYPD, while being supervised and monitored by the New York City Police Commissioner and his delegates, conspired to and did intentionally deprive Patricia Ranta, Nicholas Ranta, and Priscilla Ranta of their intimate familial relations with David Ranta, by improperly coaching a key identification witnesses, creation and perpetuation of false evidence, improperly incentivizing the giving of false testimony by another key witness, suppression of exculpatory evidence, and perjury of themselves at trial, leading to David Ranta's conviction on May 22, 1991.

5.     The misconduct by Detectives Scarcella and Chmil and John and Jane Doe Police Officers and the NYPD included the initiation and continuation of the deprivation of familial relations of Patricia Ranta, Nicholas Ranta, and Priscilla Ranta with David Ranta through his

malicious prosecution, unfair trial, and wrongful conviction and imprisonment, and resulted from continued negligence, recklessness, and/or deliberate indifference, before and during the investigation and prosecution of David Ranta, and through the date of his release on March 21, 2013, and by the NYPD Police Commissioner and his delegates, with regard to the hiring, retention, training, supervision, and disciplining of police detectives and officers, despite repeated notice of their failures to comply with their obligations to investigate, arrest and initiate the prosecution of criminal suspects and defendants in accordance with the common law, the statutes, and the Constitution of the State of New York, and of the United States.

6. The pervasive and systematic official misconduct that tore the fabric of the Ranta family unit and caused David Ranta's wrongful imprisonment occurred through actors who deprived Patricia Ranta, Nicholas Ranta, and Priscilla Ranta of their constitutional protections of familial relations and caused David Ranta to be wrongly arrested, prosecuted, convicted, and imprisoned and who were acting with the direct participation, knowledge, and/or acquiescence of supervisors and policymakers in, and pursuant to policies, customs, or patterns and practices of misconduct and egregious failures of supervision and oversight of, the NYPD and Kings County District Attorney's Office.

7. Defendants' systematic misconduct caused Plaintiffs to suffer a tragic deprivation of a husband and father who will never be the same. Defendants took David Ranta away from Plaintiffs, framed him for a murder he not commit, and locked him away for over 23 years, dramatically altering the course of Plaintiffs' lives and who they each are as human beings, all in violation of their well-established constitutional rights to familial association and access to courts.

## JURISDICTION

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

9.      Supplemental jurisdiction over Plaintiffs' pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

10.     Plaintiffs have complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York on or before October 18, 2013, within the time granted by Order of the New York Supreme Court, Kings County, pursuant to and in compliance with New York General Municipal Law Section 50-e.  More than 30 days have elapsed since the service of that notice, and adjustment or payment thereof has been neglected or refused, and no offer of settlement has been made.

## VENUE

11.     As the judicial district in which the claims arose, venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

12.     Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs demand a jury trial on each and every one of the claims as pled herein.

## PARTIES

13.     Plaintiff Patricia Ranta was at the times most relevant to this Complaint a resident of Kings County, New York.  Patrica Ranta is David Ranta's former wife and currently lives in Oak Ridge, New Jersey.

14.     Plaintiff Nicholas Ranta was at the times most relevant to this Complaint a resident of Kings County, New York. Nicholas Ranta is David and Patricia Ranta's natural son and currently lives in Oak Ridge, New Jersey.

15.     Plaintiff Priscilla Ranta was at the times most relevant to this Complaint a resident of Kings County, New York. Priscilla Ranta is David and Patricia Ranta's natural daughter and currently lives in Oak Ridge, New Jersey.

16.     Defendant Louis Scarcella was at all times relevant to this Complaint a duly appointed and acting police officer of the NYPD with the rank of a detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York. He is sued individually and in his official capacity.

17.     Defendant Stephen Chmil was at all times relevant to this Complaint a duly appointed and acting police office of the NYPD with the rank of a detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York. He is sued individually and in his official capacity.

18.     Defendants John and Jane Police Officers, whose actual names plaintiffs have been unable to ascertain, but who are sued herein by the fictitious designation "John and Jane Doe" include individual officers, direct supervisors and command-level supervisors within the NYPD, who were at all times relevant to this Complaint duly appointed and acting police officers of the NYPD and include officers with responsibilities over the hiring, training, and supervision of NYPD officers, including the individual defendants named herein, acting under

color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

19.     Defendant City of New York is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  The defendant City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the NYPD.  It was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the NYPD and the Kings County District Attorney's Office.

20.     Defendant New York City Police Department is a municipal entity created and authorized under the laws of the State of New York.  It is authorized by law to carry out all police functions for the Defendant City of New York and assumes the risks incidental to the maintenance of its police force and the employment of police officers.

## FACTS

### The Crime

21.     On February 8, 1990, around 5:30 a.m., 38-year-old Chaim Weinberger, a jewelry courier, left his apartment building in the vicinity of 130 Clymer Street in the Williamsburg neighborhood of Brooklyn carrying a suitcase full of diamonds and other valuables.

22.     Weinberger noticed a tall blond man eyeing him as he left his apartment building and when he got near his car, he saw the man following him. Weinberger placed the suitcase into the trunk and got into his car to get away.

23.     The blond man put a handkerchief over his face and drew a pistol as he approached. Weinberger drove in reverse, knocked the robber down and sped off.

24.     The robber then noticed Chaskel Werzberger, a 56-year-old Rabbi, warming up his car nearby. The gunman walked over, shot the Rabbi in the head, pulled him out of the vehicle and drove off. The Rabbi later died from his injuries. His car was found in another Brooklyn neighborhood a day later, splashed with paint in an apparent effort to cover traces of the crime.

### The Troubled Investigation

25.     NYPD Detectives Louis Scarcella and Stephen Chmil were assigned to the investigation of this case.

26.     A number of witnesses told police officers that they saw the events in full or in part. Weinberger described the gunman as being between 5'11" and 6'0" tall, with blonde hair, and shaven. Several other witnesses recalled that, prior to the crime, they saw two men in a station wagon parked nearby, one in the driver's seat and the other in the front passenger's seat.

27.     Police officers learned of Thomas Joseph Astin as a suspect through an anonymous telephone tip early on in the investigation.  Astin died in a car crash while being pursued by police on April 2, 1990.

28.     Beginning in June 1990, Detectives Scarcella and/or Chmil interviewed Dmitry Drikman, a convicted rapist facing robbery charges. Drikman led them to convicted robber and drug addict Alan Bloom, who was in jail facing charges that could send him to prison for life.

29.     Detectives Scarcella and/or Chmil said that Bloom had admitted that he attempted to rob Weinberger with David Ranta.

30.     Drikman and Bloom were then housed in the same cell together and subsequently Drikman also implicated David Ranta in the crime. Drikman's girlfriend was then interviewed and she told police she had seen David Ranta and Bloom plotting how to cover up the attempted robbery and murder.

31.     Bloom testified against David Ranta only after being granted immunity for his involvement in the robbery and murder and a promise for a reduced sentence on his pending robbery charges. Bloom told the police that he had helped to plan the robbery of Weinberger and said David Ranta was an accomplice, as was another man named Steve Shakir. Bloom said he left before the murder and did not know who the gunman was, but he said that Shakir had a gun.

32.     After a failed polygraph test, Bloom changed his story to say that not only did he see the crimes, but that David Ranta killed the Rabbi. Bloom later admitted that he lied about Shakir's involvement. He said that on the night before the crimes, he had been with Drikman. Bloom said that he had stolen the station wagon that several witnesses had observed at the crime scene prior to the crime, and that he had used the station wagon to drive himself and David Ranta to the crime scene. He said David Ranta approached Weinberger, pointed a gun at him and attempted to rob him. Bloom told police that he was supposed to be the getaway driver, but that after David Ranta left the car, a police car drove by so he moved the car and as a result, Bloom said, David Ranta did not spot the car after the botched robbery attempt and proceeded to the Rabbi's car. Bloom said David Ranta ran across the street, fired his gun twice, pulled the Rabbi from his car and fled.

33.     Bloom said he met David Ranta later that day, took the Rabbi's car and abandoned it in the Midwood section of Brooklyn. Bloom said that later, he and Drikman returned to the car and splashed white paint on the interior to obscure any fingerprints.

34.     Two others corroborated Bloom. Cheryl Herbert told the police that she had been in a relationship with David Ranta and that prior to her birthday in February, he told her he was expecting to come into possession of some nice jewelry. Herbert told police David Ranta later told her that he was in a lot of trouble because he had participated in a robbery with two others and that they had abandoned him and as a result, he had to kill someone. Herbert admitted towards the end of David Ranta's trial that she knowingly perjured herself during her testimony.

35.     Alison Picciano told the police that David Ranta had admitted to her that he had pulled the Rabbi from his car and shot him while he was on the ground. Picciano received free hotel accommodations and meals and the promise that certain open criminal cases against her would be dismissed for her testimony, a fact that was only revealed by the District Attorney on the day she was scheduled to testify.

36.     While Defendants were interrogating Bloom and Drikman, both were allowed to leave jail, smoke crack cocaine and have sex with prostitutes in return for implicating David Ranta.

**Defendants Manufacture Evidence**

37.     On August 13, 1990, at approximately 12:30 PM, more than six months after the Rabbi's murder, Detectives Scarcella and Chmil arrested David Ranta on 73rd Street between 20th and 21st Avenue, Brooklyn, New York.

38.     David Ranta was taken to a police station where Detectives Scarcella and/or Chmil and/or other police officers said that after initial denials, David Ranta eventually admitted that he had been at the crime scene with Bloom and Drikman in a station wagon, which he believed Bloom had stolen, that he had known about a plan to rob a Jewish jewel courier and that he was to have been the "lookout" during the robbery. The Detectives said David Ranta said he

saw Bloom and Drikman exchange a gun in the station wagon and that, before any of the crimes occurred, he had left the scene when Bloom and Drikman began arguing about which one of them was going to commit the actual robbery.

39.     David Ranta was placed in a lineup the following day before six witnesses.  The first witness, Weinberger, the initial target of the robbery, did not recognize anyone. The next two witnesses identified someone other than David Ranta.

40.     The fourth witness, who spoke only Yiddish and required an interpreter, initially said he didn't recognize anyone. The witness was then escorted to a nearby room with Detective Scarcella, a prosecutor and the interpreter. A tape recorder which was recording the lineup conversation was turned off and then turned back on as the witness said that, in fact, he had identified the man in position six—which was David Ranta.

41.     The fifth witness identified David Ranta and the sixth witness identified another man in the lineup.

42.     A second lineup was held later that day. Three more witnesses came in and all three identified Ranta.

43.     David Ranta took and passed one or more polygraph examinations.

44.     David Ranta went on trial in New York Supreme Court in May 1991.  Bloom testified, as did Herbert and Picciano, portraying David Ranta as the gunman. Bloom told the jury that when he and Ranta met later in the day after the crime, David Ranta said, "Why did you leave me? I had to kill someone."  Picciano testified that David Ranta told her, "I had to do what I had to do. I shot him."      David Ranta's statement to police, which portrayed him as an accomplice instead of the gunman, was presented to the jury as well.  The trial judge was critical of Detective Scarcella for failing to tape record David Ranta's statement or take any notes and

for failing to take any notes of his conversations with Drikman and Bloom. Weinberger testified that David Ranta was not the gunman.

45.     On May 22, 1991, Ranta was convicted by a jury. He was sentenced to 37 ½ years to life in prison.

46.     His initial appeal was denied, but in 1996, Astin's wife signed a sworn affidavit saying that her husband, before he was killed in a car crash, had admitted that he killed the Rabbi. She said that Astin left their home at 4 a.m. on the day of the crime and returned later in tears, he had shot a man following a failed robbery attempt of a jewelry courier in Brooklyn on February 8, 1990. Despite this affidavit, Ranta's motion for a new trial was denied.

### Exoneration

47.     In 2011, the Kings County District Attorney created a Conviction Integrity Unit began re-investigating David Ranta's case.

48.     One of the witnesses who identified Ranta in the lineup said Detective Louis Scarcella coached him to pick Ranta.

49.     Kings County prosecutor investigators also learned that while defendants were interrogating Bloom and Drikman, both were allowed to leave jail, smoke crack cocaine and have sex with prostitutes in return for implicating Ranta.

50.     Drikman and his girlfriend also recanted their accounts that implicated Bloom and Ranta.

51.     On March 21, 2013, the Kings County Supreme Court Justice Miriam Cyrulnik granted David Ranta's Motion to Vacate his conviction, which was not opposed by the King's County District Attorney's Office, Conviction Integrity Unit, and released him from incarceration.

52.     At the time of Mr. Ranta's arrest and incarceration, Patricia Ranta was married to David Ranta, and they were together an intimate family unit raising their children Nicholas, age 5, and Priscilla Ranta, age 2, in Brooklyn, New York.

53.     Mr. Ranta spent over twenty-three years imprisoned for the crime, during which time Patricia Ranta, Nicholas Ranta, and Priscilla Ranta were denied the right to intimate and familial association with Mr. Ranta.

54.     Patricia Ranta was granted a divorce on the ground of Mr. Ranta's incarceration on or about 2005.  She never remarried.

### Pattern and Practice of Misconduct by the NYPD

55.     Defendants, including Detectives Louis Scarcella and Stephen Chmil and John and Jane Doe Police Officers, were personally involved in and participated directly in the constitutional violations claimed herein, and/or after being informed of the violation through a report or appeal, failed to remedy the wrong, and/or created a policy or custom under which unconstitutional practices occurred and allowed the continuance of such a policy or custom and/or were grossly negligent in supervising subordinates, including the individual Defendants named herein, who committed the wrongful acts and/or exhibited deliberate indifference to the rights of Plaintiffs by failing to act on information indicating that unconstitutional acts were occurring.

56.     The aforementioned incident was caused by the policies and customs, and the carelessness, negligence, gross negligence, and/or reckless indifference of the City of New York and the NYPD in its failure to properly hire, supervise, control, train, educate, interview, audit, monitor, discipline, and/or investigate its agents, servants, and/or employees, including but not limited to Detectives Louis Scarcella and Stephen Chmil.

57.     Since David Ranta was released, Detective Scarcella, who retired in 1999, has been exposed in the courts and in the media, including *The New York Times*, which published an article accusing Scarcella of misconduct in many investigations: fabricating evidence, coercing witnesses and concealing evidence of defendants' innocence.

58.     The Brooklyn Conviction Integrity undertook to to re-investigate all 57 cases in which Detective Scarcella was involved, and dozens of other cases, mostly from the same time period.

59.     Teresa Gomez, a crack addict, testified as an eyewitness in six separate murder cases involving Detective Scarcella.

60.     Upon information and belief its was the practice and pattern of Detective Louis Scarcella and Stephen Chmil to fabricate confessions either by making them up entirely, as in the case of David Ranta, who claims that he never made any confession in his case, or by coercion using physical force, as alleged by Sundhe Moses, who was convicted for shooting a four year old to death in 1997.  In a review of cases by the New York Times, it was reported that in at least five murder cases, suspects questioned by Detective Scarcella began their confessions with either "you got it right" or "I was there".  The confession attributed to David Ranta began "I was there."

61.     Robert Logan, found guilty in a 1997 killing investigated by Detective Scarcella, was recently freed from prison after a review by the Brooklyn District Attorney's Office, which found a major discrepancy in the story of a questionable eye witness who was released from prison on the day of the crime, and had this information been disclosed, would most likely not have been allowed to identify Logan in court.

62.     On May 6, 2014, Kings County District Attorney Ken Thompson announced that as a result of the Integrity Unit's investigation into Detective Scarcella, the murder convictions of Darryl Austin, Alvena Jennette and Robert Hill should be vacated and the charges dismissed. Thompson said in a statement that "based on a comprehensive review of these cases, it is clear that testimony from the same problematic witness undermined the integrity of these convictions, and resulted in an unfair trial for each of these defendants."

63.     The Exoneration Initiative, a nonprofit group in Manhattan, has documented at least five cases of Detective Chmil's that raise significant questions and no other New York City detective's name appears more frequently than Mr. Chmil's in the Exoneration Initiative's caseload of 300 convictions that are deemed probably wrongful.

64.     One of the most disturbing cases involving Detective Chmil is a case on which he was not teamed with Detective Scarcella. In 1985, Jeffrey Campbell, a crack addict, helped avoid jail by implicating club owner Valance Cole for a drug-related murder. However, in 1994, just before he died of AIDS, Campbell claimed that Detective Chmil had told him to frame Cole, and even gave him a script to read. Cole is still in prison.

65.     The City of New York and the NYPD knew, or in absence of their deliberate and conscious-shocking indifference should have known, that its police officers, including Detectives Scarcella and Chmil and John and Jane Doe Police Officers, maintained unconstitutional customs, policies and practices, including failing to abide by proper procedures, fabricating and coercing confessions, failing to investigate evidence and misrepresenting evidence of innocence, intentional coaching of witnesses to make false identifications, improper incentivizing the giving of false testimony,  suppression of exculpatory evidence, and perjury at trial.

**DAMAGES**

66.     The actions of the Defendants deprived Plaintiffs Patricia Ranta, Nicholas Ranta, and Priscilla Ranta of their civil rights and their right of access to the courts under the First Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

67.     As a direct and proximate result of the acts of the defendants, Plaintiffs Patricia Ranta, Nicholas Ranta, and Priscilla Ranta suffered pecuniary and non-pecuniary damages in that they were deprived of those benefits one would normally derive from the presence of their husband and father, David Ranta after his wrongful arrest and incarceration by defendants.  At the time David Ranta was initially detained for this crime, Patricia Ranta was 23 years old and married to David Ranta since she was 18 years old; Nicholas Ranta was 5 years old, and Priscilla Ranta was 3 years old.  As a result of their father' absence, Nicholas and Priscilla Ranta suffered the loss of society, companionship, advice, moral support, family services, attention, protection, parental care, and financial support.  As a result of her husband's absence, Patricia Ranta suffered the loss of society, companionship, advice, moral support, family services, attention, protection, spousal care, comfort, guidance, counsel and financial support.   Patricia Ranta, Nicholas Ranta, and Priscilla Ranta also suffered from severe emotional and mental anguish, bereavement, and the stigma of being the wife and children of a man who was tried and convicted of highly publicized murder of a beloved Rabbi.

68.     All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

69.     Nicholas Ranta and Priscilla Ranta have a constitutionally protected liberty interest in the companionship and society of their father, David Ranta.

70.     Nicholas Ranta and Priscilla Ranta have a fundamental constitutional right to the support, companionship and parenting of their father, David Ranta.

71.     Patricia Ranta had a constitutionally protected liberty interest in the companionship and society of her husband, David Ranta.

72.     Patricia Ranta had a fundamental constitutional right to the support, companionship and parenting of her husband, David Ranta.

73.     At the time of David Ranta's arrest, his children Nicholas Ranta was 5 years old and Priscilla Ranta was 3 years old; his wife Patricia Ranta was 23.

74.     The right a family to remain together without unwarranted coercive interference by the government is one of the most essential and basic aspects of constitutionally recognized family privacy rights.

75.     Through the conduct alleged in the Complaint, Defendants deprived Patricia Ranta, Nicholas Ranta, and Priscilla Ranta of their fundamental rights, under the First and Fourteenth Amendments, to familial association by knowingly removing their father and husband, their intimate family patriarch, from their lives by falsely accusing, prosecuting, and wrongfully convicting David Ranta of a crime he did not commit.

76.     Defendants' conduct was purposefully directed at the relationship of Patricia Ranta, Nicholas Ranta, and Priscilla Ranta with their husband and father, David Ranta and caused them to doubt David Ranta's innocence.  Had Plaintiff's known the true nature of Defendants' conduct as described herein, they would have assisted David Ranta in his effort to prove his innocence.

16

77.    Defendants intended, or at a minimum were reckless and deliberately indifferent to the obvious risk, that their conduct would interfere with the constitutionally protected relationship between Patricia Ranta and her husband, and between Nicholas Ranta and Priscilla Ranta with their father David Ranta.  Specifically, Defendants knew that plaintiffs' intimate family patriarch, David Ranta, was framed, falsely imprisoned, maliciously prosecuted, unfairly tried, and wrongfully convicted and incarcerated, carried out by defendants' malicious scheme to arrest of David Ranta, which they did on August 13, 1990, without justification or provocation, and without probable cause, indeed knowing that David Ranta did not murder the Rabbi.

78.    In the six months prior to David Ranta's arrest and leading up to and including his criminal trial, Defendants Detectives Scarcella and Chmil, and other employees of the New York City Police Department, while being supervised and monitored by the New York City Police Commissioner and his delegates who willfully ignored their improper tactics, intentionally coached a key identification witness to make a false identification in a lineup, improperly incentivized the giving of false testimony by another key "witness", suppressed exculpatory evidence, and perjured themselves at trial.

79.    Defendants committed these shocking, arbitrary, and egregious acts under color of state law, intentionally, and with deliberate indifference to the established constitutional rights of Patricia Ranta, Nicholas Ranta, and Priscilla Ranta.  No reasonable police detective and no reason person in any position in 1990 would have believed this conduct was lawful.

80.    Defendants' acts were an arbitrary and undue intrusion on the relationship between Patricia Ranta, Nicholas Ranta, and Priscilla Ranta and David Ranta and effectively ended their intimate familial relationship with him.

81.     In wrongly arresting, convicting, and imprisoning David Ranta for over 23 years, Defendants intended to isolate him from Patricia Ranta, Nicholas Ranta, and Priscilla Ranta specifically and defendants did so with the intent to deny Patricia Ranta, Nicholas Ranta, and Priscilla Ranta from intimate association with David Ranta.

82.     Defendants' acts were intended to malign Patricia Ranta, Nicholas Ranta, and Priscilla Ranta from David Ranta, and Defendants intentionally alienated Plaintiffs from David Ranta during the investigation and incarceration.

83.     In depriving Patricia Ranta, Nicholas Ranta, and Priscilla Ranta from having personal bonds and drawing emotional enrichment from close ties with their husband and father David Ranta, and in preventing the cultivating and transmitting of shared ideals and beliefs, the unwarranted state interference destroyed Plaintiffs' ability independently to define their own identity, that is central to any concept of liberty.

84.     Defendants' behavior was intentionally directed at the familial relationship.

85.     These acts caused Patricia Ranta, Nicholas Ranta, and Priscilla Ranta to suffer the damages set forth above.

86.     Defendants are liable for loss of consortium and marital benefits of Patricia Ranta and loss of consortium of Nicholas Ranta and Priscilla Ranta by reason of the false arrest and false imprisonment of David Ranta by the defendants and the municipal Defendants' negligent supervision, training, hiring, retention and/or discipline and failure to intervene; Defendants' intentional and/or negligent infliction of emotional and mental pain, suffering and distress; and all other damages allowed by statute and case law.

87.     These acts caused Patricia Ranta, Nicholas Ranta, and Priscilla Ranta to suffer the damages set forth above.

## COUNT I
## Intentional Infliction of Emotional Distress

88.     Patricia Ranta, Nicholas Ranta, and Priscilla Ranta hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

89.     Defendants engaged in, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing emotional distress to Plaintiffs. As a result of Defendants' actions, Plaintiffs suffered and continue to suffer severe emotional distress in the form of countless sleepless nights, night terrors, feelings of helplessness, suicide attempts, bullying, as well as being shunned by society as the wife and children of a murderer.

90.     These acts caused Patricia Ranta, Nicholas Ranta, and Priscilla Ranta to suffer the damages set forth above.

## COUNT II
## Negligent Infliction of Emotional Distress

91.     Patricia Ranta, Nicholas Ranta, and Priscilla Ranta hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

92.     Defendants owed a duty of care to the Plaintiffs to act with reasonable care and breached that duty when they wrongfully arrested and imprisoned David Ranta and lied to plaintiffs regarding his guild, thereby denying the Plaintiffs of their relationship with their husband and father. In denying the Plaintiffs a relationship with David Ranta, the Plaintiffs suffered and continue to suffer severe emotional distress in the form of countless sleepless nights, night terrors, feelings of helplessness, suicide attempts, bullying, as well as being shunned by society as the wife and children of a murderer.

93.    Defendants' actions resulted in the direct and immediate harm to the Plaintiffs as their family was completely destroyed by the wrongful conviction of David Ranta.

94.    These acts caused Patricia Ranta, Nicholas Ranta, and Priscilla Ranta to suffer the damages set forth above.

## COUNT III

## Loss of Consortium

95.    Patricia Ranta, Nicholas Ranta, and Priscilla Ranta hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

96.    Patricia Ranta is now the ex-wife of David Ranta.

97.    Because of the Defendants' actions, which erroneously put the Plaintiffs' husband and father in jail, Plaintiffs were denied their husband's and father's love, companionship, affection, solace, support and much more.  In the case of Patricia Ranta, she was denied sexual relations and support.  In the case of Nicholas and Priscilla Ranta, they were denied parental guidance and support.

98.    The Defendants actions directly interfered with the Plaintiff's relationship with her husband, ultimately leading the Plaintiff to file for divorce.

99.    Plaintiff's ex-husband, David Ranta, remarried.

100.    These acts caused Patricia Ranta, Nicholas Ranta, and Priscilla Ranta to suffer the damages set forth above.

## Count IV

## Negligent Hiring, Training and Supervision Under State Law against Defendant City of New York

101.    Plaintiffs Patricia Ranta, Nicholas Ranta, and Priscilla Ranta hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

102.     By virtue of the foregoing, defendant City of New York is liable to plaintiffs because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the NYPD with regard to their aforementioned duties, and for negligent retention of same.

**WHEREFORE,** Patricia Ranta, Nicholas Ranta, and Priscilla Ranta pray as follows:

A.     That the Court award compensatory damages to them and against Defendants, jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to them, and against all individual Defendants, in an amount to be determined at trial but not less than $15,000,000.00, that will deter such conduct by Defendants in the future;

C.     For a trial by jury;

D.     For pre-judgment and post-judgment interest and recovery of their costs as allowed by law, including reasonable attorneys' fees pursuant; and

E  .     For any and all other relief to which they may be entitled.

Dated: New York, New York
        July 22, 2019                                Respectfully submitted,


                                        /s/ Peter C. Dee_____
                                        Peter C. Dee
                                        Mavronicolas & Dee LLP
                                        228 East 45th Street, 6th Floor
                                        New York, New York 10017
                                        (646) 770-1256
                                        pdee@mavrolaw.com
                                        *Attorneys for Plaintiffs Patricia Ranta,*
                                        *Nicholas Ranta, and Priscilla Ranta*