**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
PATRICIA RANTA, NICHOLAS RANTA, and
PRISCILLA RANTA,

                              Plaintiffs,                Case No. 14-CV-3794 (FB) (LB)

     against

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, and LOUIS SCARCELLA,
and STEPHEN CHMIL, Individually and as
Members of the New York City Police Department,
and JOHN AND JANE DOE SUPERVISORS,

                              Defendants.
-------------------------------------------------------------------X

### PLAINTIFF'S STATEMENT CONTROVERTING DEFENDANTS' LOCAL RULE 56.1 STATEMENT and COUNTERSTATEMENT OF MATERIAL FACTS

      In opposition to Defendants' Local Rule 56.1 Statement in Support of Motion for Summary Judgment, Plaintiffs Patricia Ranta, Nicholas Ranta, and Priscilla Ranta respectfully submit this response and counterstatement of material facts:

    1.      Plaintiffs do not contest paragraph 1 of Defendants' Rule 56.1 Statement.

    2.      Plaintiffs do not contest paragraph 2 of Defendants' Rule 56.1 Statement.

    3.      Plaintiffs do not contest paragraph 3 of Defendants' Rule 56.1 Statement.

    4.      Plaintiffs do not contest paragraph 4 of the Defendants' Rule 56.1 Statement.

    5.      Plaintiffs do not contest paragraph 5 of the Defendants' Rule 56.1 Statement, but clarify that David Ranta's use of alcohol was a sporadic issue in the marriage, and the couple would argue about the issue "every so often."  (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 35, ll. 8-12)

6.     Plaintiffs do not contest paragraph 6 of Defendants' Rule 56.1 Statement, but clarify that David Ranta's use of alcohol was a sporadic issue in the marriage, and the couple would argue about the issue "every so often.. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 35, l. 8 - p. 37, l. 8)

7.     Plaintiffs do not contest paragraph 7 of Defendants' Rule 56.1 Statement, but clarify that David Ranta's use of alcohol was a sporadic issue in the marriage, and the couple would argue about the issue "every so often." (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 35, ll. 8-12)

8.     Plaintiffs do not contest paragraph 8 of Defendants' Rule 56.1 Statement, but clarify that David Ranta's use of alcohol was a sporadic issue in the marriage, and the couple would argue about the issue "every so often." (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 35, ll. 8-12; p. 48, ll. 12-24)

9.     Plaintiffs do not contest paragraph 9 of Defendants' Rule 56.1 Statement.

10.     Plaintiffs dispute and object to paragraph 10 of Defendants' Rule 56.1 Statement. When asked "Was [David Ranta] belligerent when [David Ranta] came home drunk?" Patricia Ranta responded, "No, it was those two times that he was belligerent." (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 35, l. 8 – p. 36, l. 6; p. 48, l. 22 – p. 49, l. 4)

11.     Plaintiffs do not contest paragraph 11 of Defendants' Rule 56.1 Statement, but clarify that Patricia Ranta asked David Ranta to move out of the marital home to work on his issues with the goal that they would reunite as he got control of his drinking. The separation was healthy for the couple because David Ranta was in fact improving himself to be there for his family.  (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 37, ll. 3-14; p. 96, ll. 6-17)

12.     Plaintiffs do not contest paragraph 12 of Defendants' Rule 56.1 Statement, but clarify that Patricia Ranta understood that David Ranta's difficulties with alcohol stemmed from the disease of alcoholism. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 37, ll. 3-8)

13.     Plaintiffs do not contest paragraph 13 of Defendants' Rule 56.1 Statement.

14.     Plaintiffs contest paragraph 14 of Defendants' Rule 56.1 Statement because the evidence shows that before David Ranta was arrested for a murder he didn't commit, "he was showing signs that…he was preparing himself better to take care of the kids and [Patricia Ranta]." (Ex. A to Dee Decl., 50-h Hearing Testimony of Patricia Ranta, p. 9, ll. 15-20; Ex. B to Dee Decl., Patricia Ranta Dep. Tr, p. 35, l. 8 - p. 37, l. 14)

15.     Plaintiffs do not contest paragraph 15 of Defendants' Rule 56.1 Statement, but clarify that Patricia Ranta saw mother-in-law issues as inherent to marriage. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 34, ll. 18-21)

16.     Plaintiffs do not contest paragraph 16 of Defendants' Rule 56.1 Statement.

17.     Plaintiffs do not contest paragraph 17 of Defendants' Rule 56.1 Statement.

18.     Plaintiffs contest and object to paragraph 18 of Defendants' Rule 56.1 Statement. Patricia Ranta testified in her deposition that David Ranta's temper got bad twice in their marriage. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 46, ll. 17-20). Patricia Ranta was happy in the marriage despite their problems.  (*Id.*, p. 87, ll. 3-18)

19.     Plaintiffs do not contest paragraph 19 of Defendants' Rule 56.1 Statement.

20.     Plaintiffs do not contest paragraph 20 of Defendants' Rule 56.1 Statement.

21.     Plaintiffs do not contest paragraph 21 of Defendants' Rule 56.1 Statement.

22.     Plaintiffs do not contest paragraph 22 of Defendants' Rule 56.1 Statement.

23.     Plaintiffs do not contest paragraph 23 of Defendants' Rule 56.1 Statement

24.     Plaintiffs do not contest paragraph 24 of Defendants' Rule 56.1 Statement

25.     Plaintiffs do not contest paragraph 25 of Defendants' Rule 56.1 Statement

26.     Plaintiffs do not contest paragraph 26 of Defendants' Rule 56.1 Statement.

27.     Plaintiffs do not contest paragraph 27 of Defendants' Rule 56.1 Statement.

28.     Plaintiffs do not contest paragraph 28 of Defendants' Rule 56.1 Statement, but clarify that Patricia Ranta did not use the Orders of Protection to keep David Ranta out of the home entirely during that time, but only kept them for infrequent instances when he was unruly. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 35, ll. 8-12; p. 52, ll. 19-25)

29.      Plaintiffs do not contest paragraph 29 of Defendants' Rule 56.1 Statement.

30.     Plaintiffs do not contest paragraph 30 of Defendants' Rule 56.1 Statement, but clarify that David Ranta would "resid[e] on and off where [he] was working…[he] usually stayed across the street where [his] brother owned a house…right across from the wedding hall." (Ex. C to Dee Decl., David Ranta Dep. Tr., p. 18, ll. 19-24)

31.     Plaintiffs do not contest paragraph 31 of Defendants' Rule 56.1 Statement, but clarify that the separation was the healthy thing for the couple to do to work on their marriage, and that David Ranta was improving on his issues when he was wrongfully ripped from his family and prosecuted for a crime he did not commit. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 96, ll. 6-17).   Patricia Ranta believed that there was a reasonable possibility of reconciliation as long as David Ranta was able to maintain his sobriety, but due his wrongful arrest and conviction, they never got the chance.  (*Id.* at p. 92, ll. 4-20).

32.     Plaintiffs do not contest paragraph 32 of Defendants' Rule 56.1 Statement, but clarify that Patricia Ranta understood that David Ranta's alcoholism was a disease, and she was

standing by him while he worked on the issue (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 37, ll. 3-8; p. 96,  ll. 6-17)

33.     Plaintiffs do not contest paragraph 33 of Defendants' Rule 56.1 Statement, but clarify that David Ranta had been successfully improving on his issues when he was arrested and prosecuted for a crime that he did not commit. (Ex. A to Dee Decl., 50-h Hearing Testimony of Patricia Ranta, p. 9, ll. 7-20; Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 96, ll. 6-17)

34.     Plaintiffs do not contest paragraph 34 of Defendants' Rule 56.1 Statement.

35.     Plaintiffs object to paragraph 35 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

36.     Plaintiffs object to paragraph 36 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

37.     Plaintiffs object to paragraph 37 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

38.     Plaintiffs object to paragraph 38 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

39.     Plaintiffs object to paragraph 39 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

40.     Plaintiffs object to paragraph 40 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

41.     Plaintiffs object to paragraph 41 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

42.     Plaintiffs object to paragraph 42 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

43.     Plaintiffs object to paragraph 43 of Defendants' 56.1 Statement as the facts are immaterial and irrelevant to the issues in this case. The evidence is also more prejudicial than probative and is inadmissible at trial.

44.     Plaintiffs do not contest paragraph 44 of Defendants' Rule 56.1 Statement.

45.     Plaintiffs do not contest paragraph 45 of Defendants' Rule 56.1 Statement.

46.     Plaintiffs do not contest paragraph 46 of Defendants' Rule 56.1 Statement.

47.     Plaintiffs do not contest paragraph 47 of Defendants' Rule 56.1 Statement.

48.     Plaintiffs do not contest paragraph 48 of Defendants' Rule 56.1 Statement, but clarify that Patricia Ranta waited until 2005 to divorce David Ranta because he was the love of her life and she kept hoping that he would be exonerated and be able to come home to her. There was no talk of divorce before the arrest. (Ex. A to Dee Decl., 50-h Hearing Testimony of Patricia Ranta, p. 43, ll. 2-4; Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 90, ll. 3-7; p. 138, ll. 7-16)

49.     Plaintiffs do not contest paragraph 49 of Defendants' Rule 56.1 Statement.

50.     Plaintiffs do not contest paragraph 50 of Defendants' Rule 56.1 Statement.

51.    Plaintiffs do not contest paragraph 51 of Defendants' Rule 56.1 Statement.

52.    Plaintiffs dispute and object to paragraph 52 of Defendants' Rule 56.1 Statement because there are currently at least 17 exonerations associated with Detective Scarcella. (Ex. D to Dee Decl., The National Registry of Exonerations maintained by the University of Michigan; *see also* Declaration of Kings County District ADA Charles Linehan, dated February 9, 2022, submitted by Defendants).

53.    Plaintiffs contest paragraph 53 of Defendants' Rule 56.1 Statement. The day of David Ranta's arrest, Defendant Scarcella believes he called Patricia Ranta. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 126, l. 25 – p. 127 l. 1)

54.    Plaintiffs do not contest paragraph 54 of Defendants' Rule 56.1 Statement.

55.    Plaintiffs do not contest paragraph 55 of Defendants' Rule 56.1 Statement.

56.    Plaintiffs do not contest paragraph 56 of Defendants' Rule 56.1 Statement.

57.    Plaintiffs do not contest paragraph 57 of Defendants' Rule 56.1 Statement.

58.    Plaintiffs do not contest paragraph 58 of Defendants' Rule 56.1 Statement

59.    Plaintiffs deny paragraph 59 of Defendants' Rule 56.1 Statement.  Patricia Ranta has a history of chronic depression, chronic anxiety, chronic migraines, substance abuse, addiction, chronic and severe exposure to stress and overall poor health which she attributes to Defendants' conduct herein.  (Ex. F to Dee Decl., Patricia Ranta's Amended First Supplemental Responses and Objections to Defendants' First Set of Interrogatories and Request for Production of Documents, Response to Interrogatory No. 4.)  Plaintiffs did not feel safe going outside in their neighborhood, which had "a synagogue right next door with Hasidic Jewish people all over the place," after David Ranta was branded the killer of a beloved Brooklyn rabbi, and Plaintiffs were taunted by people outside their home.  (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 128, l. 4 – p. 129, l. 19)

60.     Plaintiffs deny paragraph 60 of Defendants' Rule 56.1 Statement.  Nicholas Ranta identified attempted suicide; substance abuse; addiction and rehabilitation; early onset and chronic exposure to extreme stress; attention deficit hyperactivity disorder (ADHD); sleep disturbance; asthma; arrythmia; and overall poor physical and mental health which he attributes to Defendants' conduct herein.  (Ex. G to Dee Decl., Nicholas Ranta's Amended First Supplemental Responses and Objections to Defendants' First Set of Interrogatories and Request for Production of Documents, Response to Interrogatory No. 4.)  Plaintiffs did not feel safe going outside in their neighborhood, which had "a synagogue right next door with Hasidic Jewish people all over the place," after David Ranta was branded the killer of a beloved Brooklyn rabbi, and Plaintiffs were taunted by people outside their home.  (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 128, l. 4 – p. 129, l. 19)

61.     Plaintiffs deny paragraph 61 of Defendants' Rule 56.1 Statement.  Patricia Ranta identified psychological distress and suffering, including chronic depression; chronic anxiety; early onset and chronic substance abuse; early onset and chronic psychological complexes relating to Plaintiff's relationships with men and authority figures; and early onset and chronic exposure to severe stress which she attributes to Defendants' conduct herein. (Ex. H to Dee Decl., Priscilla Ranta's Amended First Supplemental Responses and Objections to Defendants' First Set of Interrogatories and Request for Production of Documents, Response to Interrogatory No. 4.) Plaintiffs did not feel safe going outside in their neighborhood, which had "a synagogue right next door with Hasidic Jewish people all over the place" after David Ranta was branded the killer of a beloved Brooklyn rabbi, and Plaintiffs were  taunted by people outside their home.  (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 128, l. 4 – p. 129, l. 19)

62.     Plaintiffs contest and object to paragraph 62 of Defendants' Rule 56.1 Statement. Plaintiffs refer to the expert report of Kristin K. Kucsma, M.A., dated June 15, 2022, and annexed as Exhibit B to the Declaration of Mark Zuckerman submitted in support of Defendants' motion. Patricia Ranta also identifies a number of economic damages, including: transportation, travel and other related costs in connection with Plaintiff's family visits to David Ranta in prison during David Ranta's incarceration from 1990 to 2013; collect call charges in connection with phone calls received from David Ranta in prison, at a rate of one to three phone calls per week from 1990 to around 2007; less frequent after 2007 during final years of David Ranta's incarceration; David Ranta's 50% share of or support for Plaintiff's household expenses from date of David Ranta's arrest in 1990 to date, including but not limited to Plaintiff's mortgage down payment; mortgage payments; rent; utilities including electricity, gas, phone service, cellular phone service, cable and/or internet; automobile costs and expenses; gasoline costs; food; and other household and education related expenses.  (Ex. F to Dee Decl., Patricia Ranta's Amended First Supplemental Responses and Objections to Defendants' First Set of Interrogatories and Request for Production of Documents, Response to Interrogatory No. 5)

63.     Plaintiffs contest and object to paragraph 63 of Defendants' Rule 56.1 Statement. Plaintiffs refer to the expert report of Kristin K. Kucsma, M.A., dated June 15, 2022, and annexed as Exhibit B to the Declaration of Mark Zuckerman submitted in support of Defendants' motion. Nicholas Ranta also identifies a number of economic damages, including transportation, travel and other related costs in connection with him visiting David Ranta while he was incarcerated; loss of parental financial and economic support for Plaintiff's living expenses from August 13, 1990 to July 7, 2006; loss of past and future earning potential and opportunities arising from emotional and behavioral problems as well as decreased academic performance in school; loss of past and

future reputation and socio-economic standing as a result of David Ranta's wrongful arrest, conviction and incarceration by Defendants.  Specifically, Nicholas Ranta visited David Ranta in prison approximately three times during David Ranta's incarceration. This included one prison visit in or around summer 2000, when Plaintiff traveled to and attended at the Wende Correctional Facility for which Plaintiff paid all travel and other related costs in the amount of $535.00. (Ex. G to Dee Decl., Nicholas Ranta's Amended First Supplemental Responses and Objections to Defendants' First Set of Interrogatories and Request for Production of Documents, Response to Interrogatory No. 5)

64.     Plaintiffs contest and object to paragraph 64 of Defendants' Rule 56.1 Statement. Plaintiffs refer to the expert report of Kristin K. Kucsma, M.A., dated June 15, 2022, and annexed as Exhibit B to the Declaration of Mark Zuckerman submitted in support of Defendants' motion. Priscilla Ranta also identifies a number of economic damages, including prison visit costs in connection with visit(s) to David Ranta in prison by Priscilla Ranta individually, including transportation costs, food costs and other related costs; collect call charges from New York Correctional Facilities for phone calls from David Ranta in prison to Plaintiff, individually and/or together with other Plaintiff(s), at a frequency of one to three phone calls per week (each call for maximum call time that was permitted by New York Correctional Facility to David Ranta) from around 2006 until David Ranta's release from prison on March 21, 2013; loss of parental financial and economic support for Plaintiff's living expenses from August 13, 1990 to July 7, 2006; loss of past and future earning potential and opportunities arising from emotional and behavioral problems as well as decreased academic performance in school; loss of past and future reputation and socio-economic standing as a result of David Ranta's wrongful arrest, conviction and incarceration by Defendants. (Ex. H to Dee Decl., Priscilla Ranta's Amended First Supplemental

Responses and Objections to Defendants' First Set of Interrogatories and Request for Production

of Documents, Response to Interrogatory No. 5)

65.     Plaintiffs do not contest paragraph 65 of Defendants' Rule 56.1 Statement, but

clarify that there is no indication as to which damages the settlement purported to address, and no

assertion that Plaintiffs were or should be entitled to receive any of this as damages for their own

separate claims.

### COUNTERSTATEMENT OF ADDITONAL MATERIAL FACTS
### AS TO WHICH A GENUINE ISSUE EXISTS TO BE TRIED

66.     Patricia Ranta described the emotional of toll of David Ranta's arrest and

conviction as follows: "What emotion did I not have to deal with regarding this? Pain, suffering

anger, fear, guilt, shame I have had to hold onto for so long. My children have suffered, my

grandchildren are suffering. What else is there to say? What a horrible thing for anybody to have

to go through. Anybody." (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p 161, ll. 17-22).

67.     Nicolas Ranta describes the wrongful arrest and prosecution of his father as the

impetus of his emotional issues that led to a life of addiction:

> Q: So you blame the people that took away your father for your
> opiate abuse?
>
> A: I do.
>
> Q: And why is that?
>
> A: Well, because of the not wanting to not feel pain, not feel
> shallow, not feel broken would come from people picking on me in
> high school and in junior high. Having friends and relatives turn
> their back on me because my father was supposedly a murderer of a
> rabbi where the police did an investigation with the judge and
> anybody else to convict my father of 23 years, who ripped up my
> family, took away my superman, changed him, because he's not
> even the same man no more. I blame that ripple effect. I blame it
> from that point. Because I was a happy young kid. And then I [sic]
> turned out that my superman is a murderer and he is taken away

form me. And I turn around and blame him because society, the police, the judges, everybody said he was a murderer when technically he wasn't. He's found innocent. And I abandoned that man. I blame that point. That's where that stemmed from…if I didn't have abandonment, if I didn't have been destroyed at a very, very young age, I believe I would have succeeded a lot better. I believe my family would still be together where I would have a mom and a dad. And I believe that would be from where it started, just like in my own say, I believe that's where it went wrong…I believe if the government did their job correctly, my family would be whole. I would be whole.

(Ex. M to Dee Decl., Nicholas Ranta Dep. Tr., p. 65, l. 9 – p. 66, l. 17)

68.    Priscilla Ranta also suffered predictable and foreseeable mental anguish as the result of her father's wrongful arrest and conviction that had long lasting implications for her mental health.  (Ex. N to Dee Decl., Priscilla Ranta Dep. Tr., p. 132, ll. 8-20)

69.    Before the arrest and conviction (i.e. during their separation) Patricia "was upset with [David] at times, staying out late or whatever, but I loved him." (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p. 25, l. 24 – p. 26, l. 5)

70.    Patrcia Ranta continued to spend time with him separate from him interacting with the children, and spoke to him "almost every day," including about their own relationship.  (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p. 26, ll. 13-20)

71.    Patricia Ranta described her separation from David Ranta prior to his arrest as merely "taking a break from each other."  (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p. 53, ll. 7-8)

72.    David's arrest made Patricia feel "lonely, depressed, sad." (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p.  32, ll. 3-4)

73.     During David's wrongful incarceration, Patricia visited him with their children, and she also visited him by herself, and talked to him on the phone and sent him letters and pictures. (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p. 13, ll. 3-20, p. 23, l. 15 - p. 24, l. 22)

74.     After his arrest, David maintained his innocence to her and she always believed him, but the "justice system" gave her doubts at times "which makes me feel even more guilty." (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p. 10, ll. 19-21, p. 15, ll. 4-7, p. 19, ll. 8-12)

75.     Their divorce was due to no fact other than David's incarceration for more than three years.  (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p.  42, ll. 8-13)

76.     Here, Patricia and David Ranta were separated in order to work on their issues at the time of his wrongful arrest and prosecution. Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 96, ll. 6-17)

77.     Patricia Ranta stated that the separation was healthy for their marriage because she and David Ranta were affirmatively working on their marital issues. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 96, ll. 6-17)

78.     Far from having thrown in the towel, the couple was discussing reconciliation at the time he was taken from her. (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 92, ll. 4-20)

79.     Furthermore, Patricia Ranta did not divorce David Ranta for years after his imprisonment because he was the love of her life, and she kept hoping that he would be exonerated and returned to her.  (Ex. B to Dee Decl., Patricia Ranta Dep. Tr., p. 138, ll. 9-16)

80.     There was in fact, no talk of a divorce prior to David Ranta's arrest. (Ex. A to Dee Decl., Patricia Ranta 50-h Hr. Tr., p. 43, ll. 2-4)

81.     It is standard procedure for the police to use DD-5s to document their actions on the case.  (Ex K to Dee Decl., O'Mara Dep. Tr., p. 30, ll. 1-6)

82.     Sergeants, as supervisors to detectives, should have known that detectives weren't turning in DD-5s in the course of their investigation, and they should address and correct the situation.  (Ex. V to Dee Decl., Thomas Mauro Dep. Tr., p. 13, l. 7 – p. 15, l.3; p. 29, l. 17 - p. 30, l. 15; p. 59, l. 19 – p. 60, l. 18)

83.     Defendant Scarcella was never trained by the NYPD in how to interview witnesses. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 49, ll-13)

84.     Defendant Scarcella was never trained by the NYPD in how to preserve evidence. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 49, ll. 15-18)

85.     Defendant Scarcella was never trained by the NYPD in obtaining a confession. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 49, ll. 19-22)

86.     Defendant Scarcella never saw any written NYPD procedures to follow in the course of investigating a homicide during his employment at the NYPD. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 53, ll. 18-23)

87.     David Ranta was arrested for the murder of Rabbi Chaskel Werzberger on August 13, 1990.

88.     Scarcella and Chmil were detectives in the NYPD Brooklyn North Homicide Squad at the time Rabbi Chaskel Werzberger was murdered on February 8, 1990.  (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 85, l. 20 - p. 88, l. 10)

89.     The Kings County Supreme Court's criminal court records and files in the case against David Ranta were allegedly destroyed in a warehouse fire.  (Dee. Decl. ¶ 26)

90.     Scarcella and Chmil were the lead detectives on the Rabbi Werzberger murder case. (Ex. X to Dee Decl., Shields Dep. Tr., p. 23, ll. 2-7)

91.     Former Sgt. Francis Shields was supervisor to the detectives, Scarcella and Chmil, during the case.  (Ex. X to Dee Decl., Shields Dep. Tr., p. 33, ll. 16-17; Ex. W to Dee Decl., Scarcella Dep. Tr., p. 65, ll. 15-16; p. 93, ll. 15-21; Ex. Y to Dee Decl., Chmil Dep. Tr., p. 166, ll. 8-11)

92.     Former Lt. Thomas Mauro was supervisor to Defendants Scarcella and Chmil during the case. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 65, l. 16; p. 93, ll. 19-20; Ex. Y to Dee Decl., Chmil Dep. Tr., p. 132, ll. 8-9; Ex. V to Dee Decl., Mauro Dep. Tr., p. 9, l. 24 - p. 10, l. 3).

93.     A crucial aspect of a NYPD detectives' job is filling out complaint follow up forms, known as DD-5s, to record every aspect of an investigation. (Ex. V to Dee Decl., Mauro Dep. Tr., p. 80, ll. 16-20; Ex. Z to Dee Decl., Lanigan Dep. Tr., p. 102, ll. 4-16 ("That's the nature of the job. That's the nature of a detective's scope of employment. They're supposed to put down on a piece of paper, memorialize anything that occurred during their investigation."); Ex. X to Dee Decl., Shields Dep. Tr., p. 26, ll. 1-2; p. 28, ll. 19-25; Ex. K to Dee Decl., O'Mara Dep. Tr., p. 30, ll. 1-6)

94.     "It would have been wrong under any circumstance…to not keep proper records of a case." (Ex. V to Dee Decl., Mauro Dep. Tr., p. 80, ll. 16-20)

95.     DD-5s are the primary means of written transfer of information up the chain of command. (Ex. X to Dee Decl., Shields Dep. Tr., p. 56, ll. 15-19)

96.     One core purpose of the DD-5 was to create a written record of detectives' investigative work so that a detective's supervisor could keep tabs on the case and the detective. (Ex. V to Dee Decl., Mauro Dep. Tr., p. 30, ll. 10-13; Ex. X to Dee Decl., Shields Dep. Tr., p. 52, ll. 7-21, p. 56, ll. 7-13; Ex. W to Dee Decl., Scarcella Dep. Tr., p. 94, ll. 9-15; Ex. Y to Dee Decl., Chmil Dep. Tr., p. 179, ll. 8-16)

97.     If DD-5s were not being completed in a case, it was standard practice at the NYPD for supervisors to inquire as to why that was from the detective who was not turning them in. (Ex. X to Dee Decl., Shields Dep. Tr., p. 51, ll. 18-25; Ex. V to Dee Decl., Mauro Dep. Tr., p. 14, l. 22 - p. 15, l. 3)

98.     When dealing with an incentivized witness, it is even more important to keep proper documentation. (Ex. V to Dee Decl., Mauro Dep. Tr., p. 60, ll. 20-24)

99.     The KCDA had no authority to instruct Defendants Scarcella and Chmil not to execute DD-5s. (Ex. K to Dee Decl., O'Mara Dep. Tr., pp. 35, l. 25 – p. 36, l. 9)

100.    Scarcella and Chmil did not turn in many DD-5s in the Ranta investigation. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 37, ll. 10-14; Ex. W to Dee Decl., Scarcella Dep. Tr., p. 58, ll. 15-19)

101.    Scarcella and Chmil failed to complete any DD-5s about the interactions between the detectives and Theresa Astin.  (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 37, ll. 23-25)

102.    There was a long period of time in the investigation where there was no documentation whatsoever of what Scarcella and Chmil were doing. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 159, ll. 14-16; Ex. AA to Dee Decl., Koss Dep. Tr., p. 56, ll. 4-7 ; Ex. J to Dee Decl., Affirmation of John P. O'Mara in response to David Ranta's C.P.L. § 440 Motion, dated March 20, 2013, ¶¶ 39-40; Ex. L to Dee Decl., NYPD Index of DD-5s in underlying criminal matter).

103.    The few DD-5s Scarcella did draft often lacked a supervisor's signature on them in the file.  (Ex. E to Dee Decl.)

104.    Defendants Scarcella and Chmil were never asked by a supervisor why they omitted the DD-5s. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 183, ll. 7-9)

105.    Scarcella and Chmil failed to complete any DD-5s regarding their investigation into suspect Astin. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 49, l.19 - p. 50, l. 2)

106.    NYPD had a protocol to use takeout orders to bring incarcerated individuals to the district attorney's office. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 127, ll. 18-23)

107.    Scarcella and Chmil took Alan Bloom out on a takeout order to visit his mother, to a pizza place, to go out and eat a couple of times, and to his girlfriend's house so he could have private time with her. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 129, ll. 22-24, p. 134, ll. 4-21; Ex. Y Dee Decl., Chmil Dep. Tr., p. 77, ll. 12-15, p. 78, ll. 3-7; Ex. K to Dee Decl., O'Mara Dep. Tr., p. 138, ll. 22-25)

108.    Scarcella stated that he took Dmitry Drikman out for pizza on a takeout order. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 136, ll. 1-4)

109.    Scarcella had used takeout orders for Drikman and Bloom to smoke crack and have sex. (Ex. I to Dee Decl., KCDA CIU Memo To File of Contact with Dmitry Drikman, p. 4; Ex. K to Dee Decl., O'Mara Dep. Tr., p. 139, ll. 1-11; Ex. AA to Dee Decl., Koss Dep. Tr., p. 59, ll. 13-21)

110.    Scarcella and Chmil knew they were abusing take out orders to coerce fabricated "eyewitness" statements from Bloom and Drikman, but they abused the system anyways. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 77, ll. 18-22)

111.    Lieutenant Mauro did not know that Scarcella and Chmil were misusing takeout orders. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 133, ll. 7-10)

112.    Defendant Scarcella did not give an accurate accounting of the takeout orders with Alan Bloom. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 260, ll. 17-21)

113.    Alan Bloom was facing five violent felony charges and got an incredible deal to frame David Ranta.  (Ex. AA to Dee Decl., Koss Dep. Tr., p. 64, l. 15)

114.    Alan Bloom and Dmitry Drikman were stickup men who committed crimes together. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 120, l. 20 – p.121, l. 2)

115.    Alan Bloom and Dmitry Drikman did not mention David Ranta being involved in the murder the first time they were interviewed. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 109, ll. 20-23)

116.    Alan Bloom never faced any charges for the murder of Rabbi Werzberger, despite implicating himself in the crime.  (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 118, ll. 13-15)

117.    Alan Bloom received a "great deal…a borderline ridiculous deal" on violent felonies he was facing in exchange for alleged information on David Ranta. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 64, ll. 12-14)

118.    Defendant Chmil believes Alan Bloom received a fair deal in exchange for his testimony against David Ranta.  (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 81, l. 15 – p. 83, l.4)

119.    Bloom and Drikman made up the story that Ranta was Rabbi Werzberger's murderer. (Ex. I to Dee Decl., KCDA CIU Memo To File of Contact with Dmitry Drikman, p. 3-6); Ex. J to Dee Decl., Affirmation of John P. O'Mara in response to David Ranta's C.P.L. § 440 Motion, dated March 20, 2013, ¶¶ 21, 23; Ex. K to Dee Decl., O'Mara Dep. Tr., p.128, ll. 6-7)

120.    Scarcella and Chmil claimed they just happened upon witness Allison Picciano while he was taking Bloom out on a takeout order. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 116, ll. 18-25; Ex. Y to Dee Decl., Chmil Dep. Tr., p. 88, ll. 19-24; p. 101, ll. 9-19)

121.    Bloom and Picciano knew each other from smoking crack together in crack house. (Ex. Y, Dee Decl., Chmil Dep. Tr., p. 90, ll. 12-23)

122.    When Defendants Scarcella and Chmil first interviewed Alan Bloom, he gave them Steven Shakir's name as the murderer of Rabbi Werzberger. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 60, l. 20 – p. 61, l. 6)

123.    Steven Shakir was in Yugoslavia at the time of the murder. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 122, ll. 6-13; Ex. AA to Dee Decl., Koss Dep. Tr., p. 61, ll. 7-11)

124.    The arrest of David Ranta was "primarily" based on information given by Alan Bloom. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 37, ll. 19-24)

125.    Scarcella and Chmil failed to complete DD-5s regarding interactions they had with Alan Bloom. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 38, ll. 6-11, p. 62, l. 6, p. 257, l. 13).

126.    David Ranta denies making a confession implicating himself in the murder of Rabbi Werzberger and claims that his signatures on Scarcella's handwritten notes on a manilla folder was obtained by fraud, or were not his signatures.  (Ex. C to Dee Decl., David Ranta Dep. Tr., p. 116, l.3 – p. 120, l. 19)

127.    Eyewitness Chiam Weinberger "vehemently insists" that David Ranta was not the perpetrator of the crime. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 70, ll. 22-25)

128.    Thomas Astin's physical appearance matched the general description of the assailant more than Ranta's did. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 52, ll. 9-11)

129.    Thomas Astin had confessed the murder of Rabbi Werzberger to his wife Theresa Astin. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 52, ll. 21-23)

130.    Thomas Astin died during the investigation during police car chase. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 53, ll. 9-19)

131.    During the investigation, Scarcella took eyewitness Chaim Weinberger to the morgue to try and identify suspect Thomas Astin. (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 144, ll. 2-7)

132.    Scarcella testified at his deposition that Thomas Astin had no damage to his face whatsoever.  (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 146, ll. 12-13)

133.    In reality, Thomas Astin was unrecognizable in the morgue after he died in a car crash, despite Defendant Scarcella having testified that Chaim Weinberger had a good view of Thomas Astin.  (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 50, ll. 3-9)

134.    Scarcella lied that Chaim Weinberger had affirmatively said Astin was not the murderer after viewing his body at the morgue, when no one could have identified Astin because his face had been smashed in by a car accident. (Ex. K to Dee Decl., O'Mara Dep., p. 50, ll. 3-9, p. 260, ll. 7-16)

135.    Chaim Weinberger nor any other witness to Rabbi Werzberger's murder was shown a picture of Thomas Astin from before he died. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 127, ll. 16-18; Ex. W to Dee Decl,, Scarcella Dep. Tr., p. 147, ll. 5-10)

136.    Scarcella and Chmil failed to complete any DD-5s regarding when the detectives brought eyewitness Chiam Weinberger to the morgue to identify suspect Thomas Astin. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 38, ll. 1-2)

137.    Scarcella claims he learned that Alan Bloom and Dmitry Drikman were potential persons with information from a Detective Nelson.  (Ex. W to Dee Decl., Scarcella Dep. Tr., p. 99, l. 18 – p. 100, l. 20)

138.    Once Defendants Scarcella and Chmil arrested David Ranta for the murder of Rabbi Werzberger, they placed Ranta in two lineups. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 115, ll. 15-17; p. 119, ll. 8-14)

139.    None of the witnesses participating in the first lineup, including Chaim Weinberger, identified David Ranta as Rabbi Werzberger's murderer. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 116, ll. 10-12)

140.    It was an irregularity at the lineup to have one of the witnesses not be able to identify anyone in the lineup, subsequently talk to an interpreter in another room with no record, and then come back and have an identification. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 95, l. 23 - p. 96, l. 3)

141.    Menachem Lieberman, one of the witnesses who was a minor at the time he viewed David Ranta's lineup, was told by a detective to "pick the guy with the big nose" so the witness asked the lineup participants to stand sideways so he could make sure he picked the guy with the biggest nose and when he saw David Ranta, David Ranta clearly had the biggest nose so Liberman picked him, even though David Ranta did not match the description of the perpetrator that he had given to the police. (Ex. J to Dee Decl., ¶20 and Ex. 2 thereto, Affidavit of Menacham Lieberman, ¶¶6-9)

142.    The KCDA CIU investigators also recalled this coaching by the detectives. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 96, ll. 7-9; Ex. AA to Dee Decl., Koss Dep. Tr., p. 36, ll. 20-24; p. 40, ll. 20-22)

143.    The KCDA came to the determination that Det. Scarcella was running the lineup. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 37., ll. 13-14; p. 187, ll. 5-8)

144.    None of Scarcella and Chmil's interviews with David Ranta after his arrest were recorded. (Ex. Y to Dee Decl., Chmil Dep. Tr., p. 116, ll. 16-24)

145.    Policy and procedure at the time Ranta was arrested was to give the suspect an opportunity to both make their statements orally and in writing, but in many of Scarcella's cases Scarcella wrote the statement himself and only had the accused sign off on Scarcella's version of the story. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 94, ll. 1-14).

146.    The DD-5 of David Ranta's alleged confession was not signed by a supervisor. (Ex. E to Dee Decl., NYPD 313-081A Complaint Follow-Up Informational form from 8/23/90)

147.    Scarcella's and Chmil's purported supervisor, former Srg. Shields, did not remember reviewing any DD-5s in Rabbi Werzberger's murder case. (Ex. X to Dee Decl., Shields Dep. Tr., p. 25, ll. 2-8)

148.    Scarcella made statements to the KCDA that were not consistent with the facts of Rabbi Werzberger's murder case; he lied. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 49, ll. 4-7)

149.    Scarcella's testimony regarding his interactions with Theresa Astin "was not consistent with the facts." (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 50, ll. 10-12)

150.    Scarcella "minimized" what he had done with Alan Bloom. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 50, ll. 15-17).

151.    Elizabeth Cruz corroborated Drikman's recantation and recanted her prior false implicating David Ranta in Rabbi Werzberger's murder case.  (Ex. J to Dee Decl., ¶22 and Ex. 3 thereto, Affidavit of Elizabeth Cruz, ¶¶8-9)

152.    Scarcella's conduct and the factual inconsistencies in the Ranta case were enough for the Conviction Integrity Unit (hereinafter "CIU") to review at least 57 other cases Scarcella

was involved in for false arrests/prosecutions. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 90, ll. 16-23)

153.    The CIU investigated Scarcella convictions that relied on a confession or incentivizing witnesses. (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 77, ll. 1-14)

154.    The Ranta case, "was just a disaster in general in terms of credibility of witnesses, police practices of Detective Scarcella and Detective Chmil, and the likelihood that Ranta had absolutely nothing to do with the case. (Ex. AA to Dee Decl., Koss Dep. Tr., p. 33, ll. 10-15)

155.    The CIU joined in David Ranta's successful motion vacate his conviction, and moved to dismiss the indictment against David Ranta.  (Ex. J to Dee Decl., Affirmation of John P. O'Mara in response to David Ranta's C.P.L. § 440 Motion, dated March 20, 2013, p. 19)

156.    District Attorney Hynes admitted that the decision to seek vacatur of David Ranta's conviction was made in part because of the conduct of Defendant Scarcella.  (Ex. O to Dee Decl., DA Hynes 2013 letter to NYT)

157.    The Mollen Report - NYC Police Corruption, dated July 7, 1994, contains an   investigation of police misconduct in the 1980s and early 1990s and an acknowledgement that perjury and falsification of evidence was widespread in NYPD. (Ex. P to Dee Decl., p. 36 – 43)

158.    Scarcella-related exoneree Alvena Jennette details the wrongdoing of the NYPD and Scarcella in his case, which predated the murder of Rabbi Werzberger, including withholding exculpatory evidence, and the use of a problematic witness, Theresa Gomez, which the KCDA found to undermine the integrity of his conviction. (Jennette Decl.)

159.    Scarcella-related exoneree Derrick Hamilton details the wrongdoing of the NYPD and Scarcella in his case, at about the same time as the Ranta case, including withholding

exculpatory evidence, coercion of the sole eyewitness, and Scarcella's perjury at trial, which the KCDA found to undermine the integrity of his conviction. (Hamilton Decl.)

160.    The sole eyewitness in Hamilton's case recanted in sworn statement that Scarcella and others coerced her fabricated testimony in January 1991, before David Ranta's conviction. (Ex. T to Dee Decl.).

161.    Scarcella-related exoneree John Bunn details the wrongdoing of the NYPD and Scarcella in his case, shortly after the Ranta case, including withholding exculpatory evidence, coercion of witness and/or fabrication of evidence, improper interrogation, improper lineup procedure, and Scarcella's perjury, which the KCDA found to undermine the integrity of his conviction. (Bunn Decl.)

162.    Judge ShawnDya Simpson, granted vacatur of Scarcella-related exoneree Rosean Hargrove, in response to his C.P.L. § 440 Motion, finding that: "[t]he pattern and practice of Scarcella's conduct...manifest[s] a disregard for rules, law and the truth" and that "the findings of this court are that the assigned Detective, Louis Scarcella, was at the time of the investigation engaged in false and misleading practices.  The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this pattern and practice.  The pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth undermines our judicial system....Scarcella has been regarded as a legend in the N.Y.P.D. for his number of homicide arrest.  There is a saying, when it is too good to be true, it usually is . . ." (Ex. Q to Dee Decl., p. 15)

163.    The KCDA joined in a motion to vacate Robert Hill's conviction, and at the hearing, KCDA Mark Hale stated: "the conviction of Mr. Hill was based primarily, almost entirely,

on the testimony of a witness who we now feel to be extremely problematic.  This particular witness . . . testified against him in a previous homicide case.  And, in fact, had been part and parcel claiming to be an eye witness in no less than six homicide cases."  (Ex. R to Dee Decl., Robert Hill 440 Hr. Tr., dated May 6, 2014, p. 2, l. 16 – p. 4 l. 1)

164.    That witness was Scarcella's contact, Theresa Gomez, who also testified against Alevena Jennette and his brothers Hill and Austin before David Ranta's conviction.  (Ex. K to Dee Decl., O'Mara Dep. Tr., p. 108, l. 23 – p. 110, l. 22; Ex. S to Dee Decl., p. 2, l. 21 – p.3, l. 17; *supra* ¶158)

165.    Scarcella-related exoneree Shabaka Shakur, whose case predated David Ranta's, was granted a new trial.   The Court found it the May 29, 2015 Decision and Order of Judge Desmond Green, in response to Shakur's C.P.L. § 440 Motion, that the "multiple cases that were or are being investigated by the Kings County District Attorney's Office wherein Scarcella was involved" were "troubling as a whole and provided context for the type of pattern and practice the defense attempted to establish . . . . Here it is both the new evidence of Scarcella's propensity to embellish or fabricate as well as the lack of alibi notice . . . that necessitates a new trial." (Ex. U to Dee Decl. p. 46)

166.    The same Order took notice that "A number of convictions have been overturned in those cases, some dealing with recantation of eyewitness testimony, forensic evidence, and other evidence sufficient to believe defendants in those matters were wrongfully convicted." (Ex. U to Dee Decl. p. 45, n. 53)

167.    Another Scarcella-related exoneree whose case predated David Ranta's is Samuel Edmonson.  The Court, in granting his motion to vacate his conviction, held that "the determination of this court that Det. Scarcella is incredible, based upon his demeanor while testifying, his

selective recollection, and the pattern of minimization of his role in investigations under scrutiny, especially the investigation underlying the instant case, weighs heavily for one outcome. An outcome enveloped in the administration of justice." *People v. Edmonson*, 76 Misc. 3d 463, 476, 170 N.Y.S.3d 862 (N.Y. Sup. Ct. 2022).

168.    In the Edmonson case, an eyewitness came forward to recant his prior testimony implicating Edmonson, stating that it was "completely fabricated" and "was developed as a result of the meetings with Det. Scarcella and Det. Morris, and that he was not actually present to witness the homicides" in question. *Id*. at 467-68.

169.    The Court credited the eyewitness recantation and testimony based on "the content of his testimony as corroborated by the proffered evidence . . . The benefits received from his cooperation at the time of the defendant's investigation and trial, by way of being taken from DOC custody to eat and engage in sexual activity, as well as the minimal prison sentence, and the belief that he was shot on the order of the defendant, serve as sufficient reasons for his fabricated trial testimony. *Id.* at 475–76. Similar tactics were used later by the Defendants in the David Ranta case.

Dated: March 13, 2023

Respectfully submitted,

/s/ Peter C. Dee
Peter C. Dee, Esq.
175 Pearl Street, Floor 1
Brooklyn, NY 11201-7508
(917) 734-7023
deepeterc@gmail.com

*Attorney for Plaintiffs Patricia Ranta,*
*Nicholas Ranta, and Priscilla Ranta*